**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CONNECTICUT CITIZENS DEFENSE | : | 3:20-cv-006460-JAM |
| LEAGUE, INC., ET AL. | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | |
| | : | |
| NED LAMONT, ET AL., | : | |
| *Defendants.* | : | MAY 21, 2020 |

**DEFENDANT LAMONT'S AND COMMISSIONER ROVELLA'S OPPOSITION TO
PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

These are extraordinary times as Connecticut faces a "dramatic challenge" from COVID-19, "a novel and easily transmitted viral disease that has prompted a rapid reorientation of workplace practices and social life in support of public health." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 126 (2d Cir. 2020) . The Constitution gives the states primary authority to respond to the pandemic, and Governor Lamont has used that authority to issue a series of Executive Orders to protect the people of Connecticut from this new and deadly disease.

One of those orders, Executive Order 7E ("the Order"), suspended the requirements of General Statutes § 29-17c, which in normal circumstances, prohibits state and local law enforcement from refusing to collect a person's fingerprints for purposes of a criminal background check (Attachment A.) The Order did not affirmatively require state or local law enforcement to stop collecting fingerprints. Instead, the Order provides discretion to law enforcement to "limit or eliminate fingerprinting hours to limit the transmission of COVID-19 or focus resources on critical public safety needs." (Id., Sec. 2) The Governor's rationale for implementing that measure is that state and local law enforcement "are critical to the response to

this public health and civil preparedness emergency," and must be free to "prioritize personnel and resources to critical public safety needs, as well as limit transmission of COVID- 19."  (Id., Pg. 2). This is a temporary order. *Id., pg. 4.*

Despite the limited scope of the Governor's Order, and the clear public health and safety rationale upon which it is based, the plaintiffs claim that the Order, and the other defendants' actions in response to the Order, violates their constitutional rights. They now seek the extraordinary remedy of a temporary restraining order, which, among other things, prohibits enforcement of the Order in the midst of a public health crisis.  Plaintiffs are not entitled to that extraordinary relief, for several reasons.

First, the plaintiffs are jurisdictionally barred from pursuing many, if not all, of their claims. Indeed, the Eleventh Amendment provides a jurisdictional bar to most of the plaintiffs' claims against the undersigned defendants. Additionally, the plaintiffs do not have Standing to pursue their various claims against the undersigned defendants.

Second, the plaintiffs can not satisfy the required criteria for the issuance of a temporary restraining order or injunction. In fact, the plaintiffs have no likelihood of success on the merits of their claim as the Supreme Court case of *Jacobson v. Commonwealth of Massachusetts,* 197 U.S. 11 (1905) clearly supports the lawfulness of the Order. Additionally, the plaintiffs can not demonstrate irreparable harm as they have not, in fact, been harmed by the Order. Also, they have a viable remedy in the State judicial system.. Moreover, a balancing of the equities and public interest, clearly weighs in favor of the defendants. Indeed, there is an obvious and compelling public interest in protecting the public health by limiting the spread of the virulent disease.

## BACKGROUND

### A.      The COVID-19 Pandemic

COVID-19 is an infectious disease that was first identified in December, 2019.  The disease has since spread globally, and the World Health Organization has declared it a global pandemic.  The disease has contributed to more than 180,000 deaths worldwide, and "has prompted a rapid reorientation of workplace practices and social life in support of public health." *Fed. Defs.*, 954 F.3d at 126.  Connecticut has not been immune to the disease which is now widespread throughout the state, with more than 36,000 confirmed cases and 3,400 deaths attributable to the disease.  Indeed, though a small state, Connecticut has the 10th most COVID-19 cases in the United States.[1]

COVID-19 is highly contagious and spreads easily from person to person.  According to the CDC, the disease primarily spreads between people during close contact via small droplets produced by coughing, sneezing, or even just talking.[2]  Public health experts believe that individuals are most infectious during the early stages of the disease.   However, because the time from exposure to onset of symptoms may be as long as fourteen days, experts believe that infected individuals may transmit the disease for a significant period of time before they feel ill.[3] Further, many infected individuals are asymptomatic, and can therefore spread the disease to others without ever knowing they were infected.[4]

### B.      The Governor's Response to the Pandemic, Including Executive Order 7E

Due to the seriousness of the disease and the ease with which it spreads, governments throughout the world have taken extraordinary measures to "flatten the curve," including but not

---

[1]      *See https://www.cdc.Gov*
[2]      *See* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.
[3]      *See* https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.
[4]      *Id.*

limited to social distancing measures.

Governor Lamont likewise has responded to the crisis to protect the people of Connecticut. Acting pursuant to his authority under General Statutes §§ 19a-131a and 28-9, the Governor declared a Public Health Emergency on March 10, 2020, and has since issued a number of Executive Orders to protect public health and safety and mitigate the impacts of the disease.[5] One of those measures is Executive Order 7E, at issue here, which among other things, temporarily provides law enforcement with the discretion to limit or eliminate fingerprint hours. (See ATTACHMENT A).

### 1.    Connecticut's Regulatory Framework For Firearm Permits

In Connecticut, all State issued firearms certificates and permits to carry pistols and revolvers ("permit") are issued by the Department of Emergency Services and Public Protection ("DESPP"). CGS 29-28, 36-38. Within DESPP, The State Licensing and Firearms Unit ('SLFU'), handles all of these matters. SLFU is located in the DESPP headquarters in Middletown. In order to obtain a State-issued firearms certificate or permit, an applicant is required to present himself to law enforcement for the taking of fingerprints so that law enforcement personnel can perform a criminal background check. CGS 29-17a. A person who possesses either a firearms certificate or a permit, is eligible to purchase and possess a gun in the state. (Affidavit of Alessandro Giannone, para 5)(ATTACHMENT B). However, in order to carry a gun, with the exception of law enforcement personnel, a party must have a valid permit. (Id.) A firearms certificate and a permit remain effective for 5 years. (Id)

The permitting process proceeds in two steps. First, the applicant must obtain a temporary pistol permit from the town or city in which the applicant resides. CGS 29-28(b).

---

[5]    *See* https://portal.ct.gov/Coronavirus/Pages/Emergency-Orders-issued-by-the-Governor-and-State-Agencies (listing Executive Orders).

Pursuant to that process, the applicant is required to submit himself in person for the purposes of having his fingerprints taken for a criminal background check. CGS 29-29. Additionally, at this stage, the local authorities make a suitability determination. (*Giannone* Affidavit, para. 11)[6] Once a person obtains a temporary pistol permit, he is eligible to carry a gun throughout the state, pending the "conversion" of that permit into a state issued permit. (Id). A person who obtains a temporary pistol permit, in normal circumstances, has 60 days to present himself to DESPP to convert the temporary permit into a state issued permit. However, in the Order, Governor Lamont extended that period of time by 90 days. (Attachment A, Sec. 3).

The second step in the permit process occurs at DESPP, where the applicant presents himself, in person, with his local permit and applies for a state-issued permit. (*Giannone Aff., para 12-17). See also* CGS 29-29. A second suitability determination is made at that stage and the applicant is either awarded, or denied, a state-issued permit. (*Id.)*

There are numerous statutory disqualifiers for permit eligibility (*Giannone Aff., para 22-23*). Should an applicant be denied or refused a permit, by either his local authority or DESPP, the applicant has an immediate right to appeal that decision. CGS 29-32b(b) provides, in pertinent part, as follows: "Any person aggrieved by any refusal to issue or renew a permit or certificate… or by a refusal or failure of any issuing authority to furnish an application as provided in Section 29-28a, may, within ninety days, appeal to the Board of Firearms Permit Examiners." The Board holds hearings in accordance with the rules of evidence, and then issues a written decision, which is appealable to the Superior Court. CGS 29-32b(e). If any issuing authority neglects or refuses to comply with a decision of the Board within ten days after notice of the Board's decision, the Board shall apply to the Superior Court for a writ of mandamus to

---

[6] If there is something in the applicant's background that causes enough concern for the local authority to believe that the applicant would either be a danger to the public or not responsible enough to carry a firearm in public, the local authority may deny the issuance of a temporary permit. (Giannone Aff., para 11).

enforce the Board's decision. (Id.)

### 2.    Executive Order 7E

The rationale of the Governor's Order, as stated in the Order itself, is a prioritization of personnel and resources of law enforcement in the face of the Covid-19 Pandemic. (Order, pg. 2). As first responders, who also bear the statutory responsibility of enforcing our criminal laws, law enforcement personnel are on the "front-line" of this crises. Additionally, by virtue of their contact with the public, law enforcement also face the possible transmission of COVID-19.[7] The Order reasonably addresses these concerns by allowing law enforcement personnel the discretion to temporarily curtail their fingerprinting.

Following the Order, on information and belief, some local Police Department have temporarily suspended their fingerprinting and processing of permits. DESPP, likewise, has also temporarily suspended all of its fingerprinting at its headquarters, as well as its processing of new permits. (*Commissioner Rovella Affidavit, para 21*)(Attachment C). However, SLFU continues to renew permits and out of state permits, which do not require face-to face interaction. (*Giannone, Aff., para 32*).   Indeed, between the dates of March 16, 2020 and May 18, 2020, SLFU processed approximately 4,000 such permits (Id., para 32). Additionally, DESPP continues to register a large number of purchased or transferred guns. In fact, for same period of time SLFU processed approximately 26,000 firearm transactions and 41,000 firearm registrations. (Id).

### C.    Plaintiffs' Allegations

The plaintiffs generally assert that they want to apply for a permit but have been denied

---

[7] Due to their critical job responsibilities, most law enforcement personnel do not have the option of working from home or other remote location.

access to the permit process. (See Complaint, para 29,34,36,40). All of the plaintiffs, with the exception of Plaintiff Gervais, assert that they contacted their local police department, which "refused" to process their permit applications. (Id.) None of the plaintiffs, with the exception of Plaintiff Gervais, allege that they had any contact or interaction with DESPP concerning their permit applications.

In regard to Plaintiff Gervais, he alleges that on April 22, 2020, he was issued a temporary permit by his local police authority. (*Complaint, para 44*). He further alleges that on the same day, he inquired of the State Police as to completing the permit process for a state-issued permit and was informed that the State Police is not processing permit applications. (*Id., para 45*). It is a conceded fact that, at all time pertinent to this action, Plaintiff Gervais possessed a firearm.[8]

As discussed, Connecticut provides a remedy at law for any person whose permit application has been refused. See CGS 29-32(b). Nevertheless, none of the plaintiffs allege that they have appealed the denial of their permit applications to The Board of Firearms Permit Examiners. Additionally, none of the plaintiffs allege a specific or imminent need for the processing of their permit application, only averring that they "would exercise my right to obtain and possess firearms, ammunition and magazines." (See All Plaintiffs' Affidavits). The plaintiffs claim to have a fear of arrest and criminal prosecution if they exercise their rights without a permit. (Id.). The plaintiffs now make various claims to preliminary and permanent injunctive relief. (See Complaint, pgs 27-29).

---

[8] The undersigned defendants have served Interrogatories an all of the plaintiffs which inquire, among other things, about gun ownership. The plaintiffs have not yet responded to the Interrogatories. However, at a May 19, 2020 phone conference with Magistrate Garfinkle, plaintiff's counsel, Mr. Fishbein, affirmatively stated that Plaintiff Gervais did possess a gun, which he purchased out-of-state. It is assumed, therefore, that Plaintiff Gervais' sworn Interrogatory response will confirm this fact.

## ARGUMENT

**I.**     **This Court Should Deny this Motion to the Extent this Court Lacks Jurisdiction Over Plaintiffs' Claims**

**A.  The Eleventh Amendment Bars Many of the Plaintiff's Claims**

Plaintiffs' Motion "necessarily fails" to the extent this "Court lacks jurisdiction to hear this case." *Sargent v. Emons*, 2013 WL 6407718, at *7 (D. Conn. Dec. 9, 2013) (Arterton, J.), *aff'd*, 582 F. App'x 51 (2d Cir. 2014) (Summary Order). The Eleventh Amendment bars Plaintiffs' claims to the extent they seek damages from the Governor and Commissioner Rovella in their  official capacity, based on either federal or state law claims.[9] *See, e.g.*, *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003) (holding that official capacity claims are barred); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984) ("*Pennhurst*") (holding that the same principle applies to state law claims).

Additionally, The Eleventh Amendment also bars Plaintiffs' claims to the extent they seek equitable relief that is retrospective, as opposed to prospective. *See, e.g.*, *Szymonik v. Connecticut*, 2020 WL 1650329, at *3 (2d Cir. Apr. 3, 2020) (Summary Order) (holding that "[t]he Eleventh Amendment bars federal courts from issuing retrospective declaratory relief against state officials for past violations of federal law," and citing cases including *Green v. Mansour*, 474 U.S. 64 (1985). Finally, the Eleventh Amendment bars Plaintiffs' claims to the extent Plaintiffs ask this Court to enjoin the defendants to ensure compliance with state law; it is well-established that "a federal court may not sit in judgment of whether a State or a State official has complied with its own law." *Dennehy v. Soto*, 2018 WL 4936003, at *2 (D. Conn. Oct. 11, 2018) (Shea, J.) (citing *Pennhurst*, 465 U.S. at 106).

---

[9] Both Defendants are sued only in their official capacity. (Complaint, para 11, 12)

Accordingly, many of the plaintiffs' claims against the undersigned defendants should be summarily dismissed due to a lack of jurisdiction.

### B.  The Plaintiffs Do Not Have Standing to Pursue Their Claims

This Motion also must fail because the Plaintiffs fail to meet their burden to establish standing. *See, Fed. Defs.*, 954 F.3d at 126 (holding that the court needed to consider standing before reviewing the district court's denial of a preliminary injunction motion).

Assuming, arguendo, that the plaintiffs have the right to seek prospective relief from the undersigned defendants that would fall outside the Eleventh Amendment's bar, they still must "allege facts that affirmatively and plausibly suggest that plaintiffs have standing to sue" for that relief. *Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56 (2d Cir, 2016).* Stated differently, plaintiffs bear the burden to prove their standing by pointing to "specific facts" that allow them to invoke the Court's Article III jurisdiction. *Clapper v. Amnesty Int'l USA, 568 U.S. 398, 412 n.4 (2013).* This burden requires the plaintiffs to "demonstrate standing for each claim they seek to press" and "for each form of relief they seek." *Town of Chester, N.Y. v. Laroe Estates, Inc., 137 S.Ct. 1645, 1650 (2017).*

The Supreme Court has called Article III standing perhaps the most important of the case-or-controversy doctrines placing limits on federal judicial power. *All For Envtl. Renewal Inc v. Pyramid Crossgates Co.,* 436 F.3d 82, 85 (2d Cir. 2006). Three elements comprise the requirement of standing: the individual initiating the suit must have: (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *United States v. Smith,* 945 F.3d 729, 736 (2d Cir. 2019).

9

### 1.  The Plaintiffs Have Not Suffered an Injury In Fact

The injury in fact requirement ensures that persons involved in the litigation have a direct stake in its outcome. *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1548 (2016). Whether a party has demonstrated an injury in fact is resolved by a two-step analysis. A court must determine (1) whether the asserted injury is "concrete" and (2) whether it is "actual or imminent." *MGM Resorts v. Malloy*, 861 F.3d 845 (2d Cir. 2017). The second prong requires that the alleged injury is, if not actual, at least "certainly impending" and "not too speculative." Id.

The evidence demonstrates that the plaintiffs, at the very most, have been temporarily delayed, during a deadly pandemic, from proceeding through the permit process.
This is not an "actual or imminent" injury that is cognizable for standing purposes. There are numerous statutory disqualifiers, as well as two separate suitability determinations to be eligible for a permit. Accordingly, it is pure conjecture and speculation to assert that even if the plaintiffs' permit applications were processed, that they would be found eligible and issued a permit.

Moreover, the plaintiffs offer vague and legally conclusive affidavits which do not allege any "concrete plans" to satisfy the actual or imminent injury requirement. *Lujan v. Defs of Wildlife*, 504 U.S. 555, 564 (1992) (plaintiff's affidavits professing an intent to visit a location in the future were "simply not enough" to establish standing because "such some day intentions— without any description of concrete plans, or indeed any specification of when the some day will be –do not support a finding of the "actual or imminent" injury that our cases require.).

Additionally, the plaintiffs suggest that they fear arrest or criminal prosecution if they carry a weapon outside their home, without a state issued permit. This same claim was recently addressed in the Northern District of Georgia, in which the plaintiffs sought a TRO; arguing that

the suspension of processing Georgia Weapons License applications, during the COVID-19 pandemic, violated their 2d Amendment rights. *Carter v. Brian Kemp, et al.*, _____ WL _____(2020), 1:20 cv 01517(SCJ) (N.D. Georgia, April 20, 2000). The District Court denied the TRO and found, among other things, that "plaintiff's generalized and speculative fear of being prosecuted for carrying a weapon (without a license) and prior to the expiration of the state emergency is not sufficiently concrete to confer standing against Governor Kemp. (Id.,pg. 13). [10]

In regard to DESPP Commissioner Rovella, as a condition precedent to the issuance of a state-issued permit by DESPP, the applicant must first obtain a local permit. (*Giannone Aff., para 12)*. Only one of the plaintiffs, Mr Gervais, has alleged that he complied with that requirement and was subsequently refused by DESPP. (*Complaint, para 45)*. However, it is a conceded fact that Plaintiff Gervais possesses a gun, and has the legal right to carry that gun (based on his local permit). Accordingly, Plaintiff Gervais clearly has not demonstrated a viable injury and does not have standing for any claim against Commissioner Rovella. Indeed, it is readily evident that none of the plaintiffs have standing to pursues their claims against Commissioner Rovella.

### 2. The Plaintiffs' Injuries are Not Fairly Traceable to the Undersigned Defendants

Faced with an unprecedented pandemic, the Governor acted responsibly and cautiously in issuing the Order. He did not close guns stores (as many states have). Nor did he prevent eligible persons from purchasing guns. Rather, in recognition of the critical nature of law enforcement, the Governor simply allowed local Police Departments, and DESPP, the discretion to eliminate or limit their fingerprint services for permit applications. The Order also provides a 90 day

---

[10] Similar to the statutory scheme in Georgia, the holder of a permit in Connecticut is only subject to a request for his permit by law enforcement, if the officer has reasonable suspicion of a crime. See CGS 29-35 (b).

extension of time for those (like Plaintiff Gervais) who had already obtained their local permit to apply for the State-issued permit.

In response to the Order, on information and belief, some local Police Departments decided to temporarily eliminate their fingerprint services for purposes of permits. However, according to the plaintiffs' allegations, some local Police authorities continue to provide temporary permits. (See Complaint, para 43-44: Plaintiff Gervais received a temporary permit from Jewitt City on April 22, 2020). Accordingly, if one were to assume that the Order resulted in some injury to the plaintiffs, that injury is not fairly traceable to the Governor and the Order, but rather the result of a third party, i.e the local Police Departments. See *Carter v. Brian Kemp et al*, *supra *15* (Because the Georgia Probate courts issue the weapons licenses, and not Governor Kemp, the plaintiffs fail to demonstrate standing to pursue their claim against the Governor).

### 3. Plaintiff's Injury is Not Likely to be Redressed By a Favorable Decision

Redressability is the "non-speculative likelihood that the injury can be remedied by the requested relief." *W.R. Huff Asset Management, LLC v. Deloite & Touche, LLP*, 549 F.3d 100, 106 (2d Cir 2008). It must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 561.

The plaintiffs claim that their injury in this case is the violation of their 2nd Amendment rights. However, it is entirely speculative to suggest that the plaintiffs' "injury" can be redressed by a favorable decision by this tribunal. At most, a favorable decision in this tribunal will allow the plaintiffs to proceed through the permit process, which does not guarantee the plaintiffs the right to a permit, or to possess a gun. Indeed, as discussed, the plaintiffs' injury is appropriately

redressed by the State of Connecticut, Board of Firearms Permit Examiners, However, the plaintiffs have not chosen to pursue that legal process.

For all of the foregoing reasons, the plaintiffs lack standing to pursue this matter against the undersigned defendants.[11]


## II.    Plaintiffs Are Not Entitled to a Temporary Restraining Order and Preliminary Injunction

It is well established that "a temporary restraining order is . . . an extraordinary remedy." *Moore v. Consol. Edison Co. of N.Y., Inc. v. Reid*y, 409 F.3d 506, 510 (2d Cir. 2005). Additionally, the same standards apply to the plaintiff's request for a temporary restraining order and their requests for injunctive relief.  *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992).

A party seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities is in his favor, and that an injunction is in the public interest. *Jones v. Wolf*, 2020 WL 1643857, at *2 (W.D.N.Y. Apr. 2, 2020) (quoting *Trump v. Deutsche Bank AG*, 943 F.3d 627, 640 (2d Cir.), *cert. granted*, 140 S. Ct. 660 (2019).[12] Moreover,  the Second Circuit has instructed that a mandatory injunction—that is, an injunction commanding a positive act, as opposed to one merely maintaining the status quo—should issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will

---

[11] Similarly, plaintiff CCDL, an incorporated entity, also lacks standing to assert the constitutional claims stated in the Complaint. *Consolidated Edison Co., v. Pataki*, 292 F.3d 338, 347 (2d Cir. 2002)(The Constitution contains "personal guarantees" that are unavailable to corporations and other organizations because the historic function of the particular guarantee has been limited to the protection of individuals).

[12] In *Trump*, the Second Circuit noted that it was unclear whether the standard applies in all cases, but applied it because in *Trump*—as here—the plaintiff was "seeking to preliminarily enjoin governmental action." *Trump*, 943 F.3d at 641.

result from a denial of preliminary relief." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). Plaintiffs bear the burden to show that the law is so clearly in their favor that no "difficult questions of law" remain based on a solid factual record, as opposed to "a wobbly foundation" built on affidavits that "boldly" make broad assertions without establishing the necessary subordinate facts. *Otoe Missouria Tribe of Indians v. New York*, 769 F.3d at 114-15 (2d Cir. 2014) . Plaintiffs have fallen far short of meeting their burden

## III.    Plaintiffs Can Not Demonstrate a Clear Likelihood of Success on the Merits

### A.  The Supreme Court's Decision in *Jacobson* Dictates The Outcome In This Case

The Supreme Court has long held that constitutional rights are not "absolute," and that they may be "subjected to all kinds of restraints and burdens in order to secure the general comfort" and "common good" of society.  *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 26 (1905).  Well over a century ago, the Supreme Court recognized that "[t]he safety and the health of the people of" a state "are, in the first instance, for that [state] to guard and protect." *Id.* at 38 (1905). "They are matters that do not ordinarily concern the national government." *Id*. Rather, "they depend, primarily, upon such action as the state, in its wisdom, may take." *Id*.

*Jacobson* is the seminal case in the area of state disease response and there is no dispute that it remains good law. *See, e.g.*, *Phillips v. City of New York*, 775 F.3d 538, 542–43 (2d Cir. 2015) (applying *Jacobson); See also Amato v. Elicker, et al*, 3:20-cv-00464, May 19, 2020, (MPS)(Applying Jacobson to a constitutional challenge to Governor Lamont's executive order) Nor is there any dispute that *Jacobson* and its progeny "clearly established that the state's police

power enables it to institute extraordinary measures to protect public health." *Zucht v. King*, 260 U.S. 174 (1922).

*Jacobson* establishes that "under the pressure of [the] great dangers" posed by infectious disease, individuals' liberty may "be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Jacobson*, 197 U.S. at 29. Those restraints can be substantial. In fact, *Jacobson* held that local officials—acting pursuant to authority from the state—could criminally charge an individual for refusing a smallpox vaccination, even though that individual offered to prove that he refused to be vaccinated because *inter alia* "he had, 'when a child,' been caused great and extreme suffering for a long period by a disease produced by vaccination; and that he had witnessed a similar result of vaccination, not only in the case of his son, but in the cases of others." *Id* at 13, 36.

The Court also indicated that apparently healthy individuals could be "held in quarantine against [their] will on board" a ship with "cases of" a disease "until it be ascertained by inspection, conducted with due diligence, that the danger of the spread of the disease among the community at large has disappeared." *Id.* at 29. The Court even noted that while an individual generally has a right "to live and work where he will" in ordinary circumstances, in an emergency he still "may be compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests, or even his religious or political convictions, to take his place in the ranks of the army of his country, and risk the chance of being shot down in its defense." *Id.*

The Jacobson Court made clear that "[e]ven liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will," and that even individuals' constitutional right to liberty temporarily narrows during an emergency. *Id.* at 26–27. The Court's holding was

15

in no way a denigration of that "greatest of all rights." *Id*. at 26. To the contrary, it was a recognition that others have equal constitutional rights and that "[r]eal liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others." *Id*. at 26.

"Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id*. at 27. To hold otherwise would unduly interfere with the states' primary constitutional role and responsibility to protect those within their jurisdictions. *Id*. at 38.

*Jacobson* applies to "*all* constitutional rights." *In re Abbott*, 954 F.3d 772, 786 (5th Cir. 2020) (emphasis in the original). That does not mean that constitutional rights "cease to exist at the first sign of a public emergency." What it means is that when a state is battling an admittedly "grave public health emergency," the federal Constitution allows the state to take actions in response to protect the entire community (including Plaintiffs) that the Constitution would not allow absent the emergency. *see Jacobson*, 197 U.S. at 13, 29 & 36 (providing examples).

The Court recognized that the state's power is not absolute and "might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public as to authorize or compel the courts to interfere for the protection of such persons." *Id*. at 28. Those circumstances would exist only where the action "purporting" to be intended to protect the public health "has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the" Constitution, even in that emergency situation. *Id*. at 31. Examples the Court gave included where a state "under the guise of exerting a police power,

invaded the domain of Federal authority," *id*. at 28, or where an individual made a showing that due to a "particular condition of his health or body" the state's actions "would be cruel and inhuman in the last degree." *Id*. at 38-39.

Clearly, the plaintiffs make no comparable showing here as it is untenable to even suggest that the Governor's Order, and the other defendants' actions in response to the Order, violates the principles set forth in *Jacobson.* Certainly, a discretionary public health measure in the face of a deadly pandemic, which may result in a temporary delay in the processing of the plaintiffs' permits (with no guarantee of their eligibility for a permit) does not constitute a "palpable invasion of Constitutional rights" or equate to "cruel and inhuman" action.

### B. Alternatively, Under a Heller Analysis, Plaintiffs Do Not Have a Likelihood of Success On The Merits

The Second Circuit typically applies a two-part test for Second Amendment challenges. "First, we consider whether the restriction burdens conduct protected by the Second Amendment. If the challenged restriction does not implicate conduct within the scope of the Second Amendment, our analysis ends and the legislation stands. Otherwise, we move to the second step of our inquiry, in which we must determine and apply the appropriate level of scrutiny." *New York State Rifle & Pistol Association, Inc. v. Cuomo*, 804 F.3d 242 (2nd Cir. 2015); citing *District of Columbia v. Heller*, 554 U.S. 570 (2008).

In this case, the Governor's Order, and Commissioner Rovella's actions in response to the Order, does not impose a burden on the plaintiffs' Second Amendment Rights, and accordingly, the analysis should end. As discussed, while the plaintiffs profess a desire to have their permit applications processed, there is no guarantee that the plaintiffs will be found eligible

17

for, and issued a permit, by the local authority or DESPP. Additionally, this is a very temporary measure and there is nothing to suggest that the local authorities and DESPP will not resume processing of the fingerprinting and permits in the immediate future. Indeed, starting on Tuesday May 26, 2020, DESPP intends to open its offices, on a limited basis, for the processing of state gun permits. (*Rovella, Affidavit, p. 29*). Additionally, it is contemplated that DESPP will open all of its service, including fingerprinting, on June 15, 2020. (Id., p. 21-22)

Moreover, to the extent that plaintiffs assert that they want to buy a gun and currently can not, it is important to note that the Second Amendment does not guarantee the right to acquire a gun, on demand, at any time. Indeed, the Supreme Court in *Heller* affirmed that "laws imposing conditions and qualifications on the sale of arms are constitutional." *Heller, at 626-27.* Since *Heller* was decided, Courts in all jurisdictions have upheld conditions and qualifications on the sale of guns, even though they bring with them delays on immediate acquisition, such as background checks, waiting periods, licensing laws, and training requirements. *Libertarian Party of Erie City v. Cuomo*, 300 F.Supp.3d 424 (W.D.N.Y 2018) (licensing); *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016)( Waiting period); *Heller v. District of Columbia*, 901 F.3d 264 (D.C. 2015)(training). Accordingly, any temporary delay in the permit process (while a pandemic rages on) does not infringe on the plaintiffs' Second Amendment rights. [13]

Because the Order, and Commissioner Rovella's actions in response to the Order, do not infringe on the plaintiffs' Second Amendment rights, there is no need to consider an appropriate level of scrutiny. *U.S. v. Decastro*, 682 F.3d 160 (2d Cir. 2012). However, should the Court proceed in this analysis, it is evident, from overwhelming authority in the Second Circuit, that an intermediate level of scrutiny would apply. *New York State Rifle and Pistol Association, Inc. v.*

---

[13] As discussed, Plaintiff Gervais is the only plaintiff who alleges any involvement with DESPP concerning his permit. However, Plaintiff Gervais possesses a gun, and has the legal right to carry that gun. Accordingly, his 2nd Amendment rights have not been compromised, at all.

*Cuomo, et al.*, 804 F.3d 242 (2015)(applying intermediate scrutiny to law prohibiting possession of certain semi-automatic weapons); Kachalsky *v. City of Westchester*, 701 F.3d 81, 88 (2d Cir. 2012)(New York law that restricted individuals' ability to carry in public was subject to intermediate scrutiny); *Shew v. Malloy*, 994 F.Supp.2d 234 (D. Conn 2014)(applying intermediate level scrutiny to ban on assault weapons).

Under intermediate scrutiny review, the pertinent inquiry is whether the government regulation is "substantially related to an important government objective." *Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989). To survive intermediate scrutiny, "the fit between the challenged regulation and the asserted objective need only be reasonable, not perfect." *Shew, supra at* 249, citing *United States v. Mazzarella, 614 F.3d 85, 89 (3rd Cir. 2010)*

The plaintiffs concede that the limit of the transmission of COVID-19 is an important governmental objective (Plaintiff's TRO brief, p.23). Therefore, the Court need only inquire whether the Order, and Commissioner Rovella's response to the Order was "substantially related to the achievement of that governmental interest." *State Rifle and Pistol Association, Supra at* 261. The answer to that question is obviously in the affirmative as there is no dispute that the COVID-19 disease primarily spreads between people during close contact via small droplets produced by coughing, sneezing, or even just talking.[14] Therefore, any limitation on face  to face interaction is substantially related to this objective.

Accordingly, should the Court apply a *Heller* analysis, the plaintiffs do not have a likelihood of success on the merits of their case.

### C.  The Plaintiffs Do Not Have A Likelihood of Success on Their Equal Protection Claim

---

[14] www.CDC.Gov

In their Complaint, the plaintiffs purport to bring an Equal Protection claim against the defendants. [15] The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center Inc*, 473 U.S. 432, 439 (1985). The Clause does not require that all persons be dealt with identically, but it does require that a distinction made must have some relevance to the purposes for which the classification is made. *Baxstrom v. Herold*, 383 U.S. 107, 111 (1966).

From a general perspective, it is simply indefensible to assert that gun owners/advocates have received disparate treatment in Connecticut during the COVID-19 pandemic. Connecticut, unlike many other states, has not closed gun stores or taken any action which interferes with gun transactions. Moreover, DESPP continues to process all permit renewals, out-of-state permits and gun registrations. Moreover, in comparison, it is noteworthy that Connecticut HAS closed many businesses which arguably place burdens on other Constitutional rights, such as bookstores, libraries, marriage licenses, social clubs, performing arts centers, etc.

From a specific perspective, plaintiffs assert that they have received disparate treatment because DESPP continues to fingerprint for other purposes. (*Complaint, para 97).* This is incorrect, as DESPP has temporarily discontinued all fingerprints for any purpose. (*Rovella Affidavit, para 21).* While the original Executive Order directed DESPP to continue to perform fingerprinting services for long term care providers (a distinction which clearly makes sense during the pandemic) that section of the Order was subsequently modified to eliminate the fingerprint requirement for long term care workers. (Id., para 20, N. 1) Additionally, DESPP has also temporarily discontinued the in-person processing of all licenses and registration (Id., para. 21 ).

Accordingly, plaintiffs have no likelihood of succeeding on their Equal Protection claim.

---

[15] The plaintiffs have not briefed this issue.

## IV.     Plaintiffs Can Not Demonstrate Irreparable Harm

"[T]he Second Circuit has made clear that 'a showing of irreparable harm is the single most important prerequisite for the issuance of injunctive relief.'" *FEI Hong Kong Co. Ltd. v. GlobalFoundries, Inc.*, 2020 WL 1444956, at *2 (S.D.N.Y. Mar. 25, 2020) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.,* 559 F. 3d 110, 118 (2d Cir. 2009) .Given the importance of that showing, "[a] demonstration of irreparable injury by the party seeking relief is an essential prerequisite to a temporary restraining order." *Id.* (quotation marks omitted). Plaintiffs' assertions of harm resulting from the Order have to be non-conclusory, plausible, and of the type that warrants granting injunctive relief. *Ragbir v. Homan*, 923 F.3d 53, 58 & n.3 (2d Cir. 2019) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The harm must be "neither remote, nor speculative, but actual and imminent." *Freedom Holdings, Inc v.* Spitzer, 408 F.3d 112, 114 (2d Cir. 2005).

The plaintiffs allegations of harm in this case are insufficient to satisfy the above standards. The Plaintiffs Affidavits are substantively identical and do not provide any non-conclusory factual basis to conclude that they have suffered any cognizable harm. Rather, Plaintiffs provide only their own conclusory statements that they have been harmed which are categorically insufficient to establish irreparable harm. *See, e.g.*, *Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) (affirming denial of preliminary injunction where movant "fail[ed] to produce any evidence of irreparable harm, other than the conclusory statement of its president"). The Court should deny Plaintiffs' Motion on that basis alone.[16]

Second, plaintiffs have not shown that there are no available remedies at law—a

---

[16] Again, in regard to Commissioner Rovella, Plaintiff Gervais can not demonstrate that he suffered any harm as he possesses a gun, and the legal right to carry that gun.

prerequisite to establishing irreparable injury. *Alabama v. Army Corps of Engineers*, 424 F.3d 117, 127 (11th Cir. 2005).  As discussed, the plaintiffs have an immediate and available remedy: an appeal to the State of Connecticut, Board of Firearms Permit Examiners.

Third, as discussed, the plaintiffs have merely been temporarily delayed in the processing of their permit applications. They have suffered no actual or imminent injury as it is entirely speculative that the plaintiffs will be found eligible for a permit by the local authority and DESPP.

Fourth, plaintiffs cannot establish irreparable harm based on alleged constitutional violations if those violations could be remedied[17] by money damages. *See, e.g.*, *Air Transp. Int'l Liab. Co. v. Aerolease Fin. Grp., Inc.*, 993 F. Supp. 118, 124–25 (D. Conn. 1998) (Droney, J.) (holding "that the mere allegation of a constitutional infringement in and of itself does not constitute irreparable harm. Rather, district courts must consider the nature of the constitutional injury before making such a conclusion," and citing cases including *Jayaraj v. Scappini*, 66 F.3d 36 (2d Cir. 1995) and *Savage v. Gorski*, 850 F.2d 64 (2d Cir. 1988)).

Plaintiffs have not met their burden to show irreparable harm.  *Lee v. Trump*, 2020 WL 1330673, at *1 (S.D.N.Y. Mar. 23, 2020) (denying temporary restraining order challenging travel ban in response to pandemic, in part, because the movant failed to plead any irreparable harm where even though "his family members from China intended to visit him in the United States in Spring 2020 and cannot due to the Government's actions . . . to the extent that their visit is delayed, that harm is hardly irreparable"). Moreover, even if the plaintiffs could be found to have shown irreparable harm, they have not met the heightened standard applicable to their request that this Court upend the existing status quo  *Jones*, 2020 WL 1643857, at *2 (quoting

---

[17] To be clear, the defendants do not believe that any award of damages is indicated.

*Tom Doherty*, 60 F.3d at 34); *see also Doe v. Univ. of Connecticut*, 2020 WL 406356, at *1 (D. Conn. Jan. 23, 2020) (Shea, J.) ("A heightened standard applies . . . when a plaintiff seeks a 'mandatory injunction,' which alters the status quo." (quoting *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)). That standard is "especially appropriate when a preliminary injunction is sought against government." *D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006), *opinion amended on denial of reh'g*, 480 F.3d 138 (2d Cir. 2007). Plaintiffs can not satisfy that standard.

## V.  The Balance of Equities and the Public Interest Weigh Heavily Against Granting this Motion

Plaintiffs bear the burden to establish that the balance of the equities and the public interest weigh in favor of the relief they demand. *See, e.g.*, *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010). "Where the government is the opposing party," these two factors "merge." *Jones*, 2020 WL 1643857, at *13.

It is readily evident that a balance of the equities and the public interest weighs heavily against this Court granting the plaintiffs' requests for injunctive relief. There are few—if any—circumstances where the state's side of the balance could be stronger. Indeed, the Second Circuit has noted the "dramatic challenge . . . presented [to government] by COVID-19, a novel and easily transmitted viral disease that has prompted a rapid reorientation of workplace practices and social life in support of public health." *Fed. Defs.*, 954 F.3d at 135. There is no dispute that the Governor has the primary constitutional responsibility to protect people in Connecticut from the deadly threat COVID-19 poses. Indeed, the public and the plaintiffs both benefit from ensuring public health and safety. *Grand River Enterprises Six Nations Ltd v.* Pryor, 425 F.3d 158, 169 (2d Cir. 2005). As our Supreme Court aptly recognized more than a century ago, the

health and safety of the people of a state are the highest Constitutional responsibility of the states. *Jacobson*, supra at 35.

On the other side of the balance, Plaintiffs acknowledge that the limit of the transmission of COVID-19 is an important governmental objective. However, they assert that this objective is less important that their right to immediately proceed through the permit process, during a pandemic. The defendants disagree with this assertion.

**Conclusion**

For the reasons set forth above, the undersigned defendants respectfully requests that this Court deny Plaintiffs' Motion.

Respectfully submitted,

DEFENDANTS

GOVERNOR NED LAMONT
JAMES ROVELLA

WILLIAM TONG
ATTORNEY GENERAL

BY: */s/ Matthew Beizer*
Matthew Beizer (#16304)
Deann Varunes
Assistant Attorneys General
Attorney General's Office
110 Sherman Street
Hartford, CT 06105
860-808-5450 (phone)
860-808-55591 (fax)
Matthew.Beizer@Ct.GOV

**<u>Certificate of Service</u>**

I hereby certify that on April 27, 2020, a copy of the foregoing was electronically filed.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system.  Parties may access this filing through the Court's system.

*/s/ Matthew Beizer*
Matthew Beizer
Assistant Attorney General
