UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CONNECTICUT CITIZENS DEFENSE | : | NO.: 3:20-CV-00646 (JAM) |
| LEAGUE, INC., AMY JONES, TODD | : | |
| SKILTON, JOHN LOWMAN, JOSEPH | : | |
| COLL, TANYSHA BROWN and | : | |
| DANIEL GERVAIS | : | |
| | : | |
| v. | : | |
| | : | |
| NED LAMONT, JAMES ROVELLA, PAUL | : | |
| MELANSON, ANDREW COTA, BRIAN | : | |
| GOULD and JAMES KENNY | : | MAY 21, 2020 |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION OF PLAINTIFFS' MOTION FOR TEMPORARY INJUNCTION

### I. FACTUAL BACKGROUND

On March 10, 2020 Connecticut Governor Ned Lamont declared a public health and civil preparedness emergency in the state of Connecticut, in response to the global pandemic of COVID-19 disease. See doc 26–1. On March 17, 2020 Governor Lamont issued executive order No. 7E, in which he suspended, *inter alia*, the statutory requirement that municipal police departments make fingerprinting available, codified at Connecticut General Statute section 29-17c(a) and provided that said suspension would last for the duration of the public health and civil preparedness emergency. See Doc. 26–2. The Towns of Farmington and Vernon suspended fingerprinting availability in response to the public health emergency. See Affidavits of Paul Melanson, Exhibit 1 and James Kenny, Exhibit 2. The Towns of Farmington and Vernon did not suspend the processing of applications for handgun permits previously filed, in which the applicants had already been through the fingerprinting process. See Melanson Affidavit Exhibit 1 and Kenny Affidavit Exhibit 2. Prior to the suspension of the fingerprinting service in the

Town of Vernon, if a person came to the police department to be fingerprinted in connection with their employment, such as a teacher, the fingerprinting would be performed at the police department and the person who was fingerprinted would maintain possession of the fingerprinting card; the Town of Vernon police department would not keep a record of said fingerprints. See Kenny Affidavit, Exhibit 2.  The Town to Vernon did not keep a copy of any fingerprints that it may have taken in the past of Plaintiff Coll in connection with his employment. See Kenny Affidavit Exhibit 2.

The Town of Vernon resumed the provision of fingerprinting services on May 20, 2020, and the Town of Farmington resumed the provision of fingerprinting services on May 21, 2020. See Melanson Affidavit Exhibit 1; Kenny Affidavit, Exhibit 2. Both Plaintiffs' counsel were notified on May 16, 2020 that fingerprinting services in the Towns of Farmington and Vernon would be resuming, and their clients could make appointments to have their fingerprints taken. See Affidavit of Thomas R. Gerarde, Exhibit 3.

## II.    PLAINTIFFS' CLAIMS

In their Amended Complaint, the Plaintiffs have alleged that the defendant Towns' suspension of fingerprinting services violated their Second Amendment right to keep and bear arms; their Fourteenth Amendment rights to Due Process, Equal Protection; and their Fourteenth Amendment right to enjoy the same privileges and immunities as all other citizens in the United States.

III.   **PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION AS TO THE TOWN OF FARMINGTON (CHIEF MELANSON) OR TOWN OF VERNON (CHIEF KENNY)**

   A.  **Legal Standard**

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Moore v. Consol. Edison Co. of New York, 409 F.3d 506, 510 (2d Cir. 2005) (citation omitted). "A decision to grant or deny a preliminary injunction is committed to the discretion of the district court." Polymer Tech. Corp. v. Mimran, 37 F.3d 74, 78 (2d. Cir. 1994) (citation omitted).

"District courts may ordinarily grant preliminary injunctions when the party seeking the injunction demonstrates (1) that he or she will suffer irreparable harm absent injunctive relief, and (2) either (a) that he or she is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." Moore, 409 F.3d at 510 (internal quotation marks omitted). "[T]he Second Circuit has made clear that 'a showing of irreparable harm is the single most important prerequisite for the issuance of injunctive relief.'" FEI Hong Kong Co. Ltd. V. GlobalFoundries, Inc., 2020 WL 1444956 at *2 (S.D.N.Y. Mar. 25, 2020) (quoting Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009).

However, a higher standard is applied when the preliminary injunction sought would "affect governmental action taken in the public interest pursuant to a statutory or regulatory scheme." Mullins v. City of New York, 626 F.3d 47, 53 (2d Cir. 2010). When this governmental action is being challenged, "the moving party cannot resort to the 'fair

ground for litigation' standard." <u>Jolly v. Coughlin</u>, 76 F.3d 468, 473 (2d Cir. 1996). Instead, the moving party is "required to demonstrate irreparable harm and a likelihood of success on the merits." <u>Id</u>. Additionally, for the plaintiffs to succeed under this higher standard, "the balance of hardships between the plaintiff and defendant" must "tip in the plaintiff's favor." <u>Salinger v. Colting</u>, 607 F.3d 68, 80 (2d Cir. 2010). And finally, "the court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction." <u>Id</u>. (Internal quotation marks omitted). The public interest consideration is applicable to all aspects of the analysis; "[w]henever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." <u>Brody v. Vill. of Port Chester</u>, 261 F.3d 288, 290-91 (2d Cir. 2001) (quotation marks omitted). "Otherwise a claim that appears meritorious at a preliminary stage but is ultimately determined to be unsuccessful will have precipitated court action that might needlessly have injured the public interest." <u>Id</u>. (quotation marks omitted).

Under Article III of the Constitution, federal courts have authority to adjudicate only "Cases" and "Controversies;" therefore, courts may not "decid[e] legal disputes or expound [] on law in the absence of such a case or controversy." <u>Already, LLC v. Nike, Inc.</u>, 568 U.S. 85, 90 (2013). "[A]n actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation. … A case becomes moot—and therefore no longer a Case or Controversy for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." <u>Id</u>. at 90-91 (internal quotation marks omitted). "Injunctive relief is considered

moot only if (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." U.S. Commodity Futures Trading Comm'n v. Escobio, 946 F.3d 1242, 1251 (11th Cir. 2020) (internal quotation marks omitted).

### B. Plaintiffs' Motion For Preliminary Injunction Must Be Denied Because The Issues Are Moot As To The Town Of Farmington (Chief Melanson) And Town Of Vernon (Chief Kenny)

A claim for injunctive relief can be dismissed as moot so long as "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." U.S. Commodity Futures Trading Comm'n, 946 F.3d at 1251. See Dorsey v. Hogan, 511 F. App'x 96, 99 (2d Cir. 2013) (Claims for injunctive relief relating to conditions of confinement are moot due to release from confinement).

An example of the mootness doctrine is seen in Chrisman v. Sisters of St. Joseph of Peace, 506 F.2d 308 (9th Cir. 1974). In Chrisman, a woman sought preliminary injunction and equitable relief against a hospital that sought to deny her a sterilization procedure. Id. at 309. The woman then received the desired sterilization procedure at another hospital. Id. The court dismissed the claim for injunction and equitable relief on grounds of mootness because of the general permanence of the sterilization procedure the woman underwent, and the parties' stipulation that the plaintiff would not reasonably expect to ever need the procedure again. Id. at 314-15.

Similarly in Nat'l Lawyers Guild Univ. of Texas Chapter v. Bd. of Regents of Univ. of Texas Sys., an off-campus group that sought to have a meeting on campus at the

University of Texas College of Law filed for a mandatory injunction requiring school officials to permit its meeting on campus at the student union. 490 F.2d 97, 98 (5th Cir. 1974). The case was dismissed as moot because the dates for the desired meeting had passed at the time of the hearing, and there was no indication that a similar case or controversy would arise in the future. Id.

Another example of the mootness doctrine is the decision in Child Evangelism Fellowship of Md., Inc. v. Montgomery Cty. Pub. Sch., 368 F. Supp. 2d 416 (D. Md. 2005), aff'd in part, rev'd in part sub nom. Child Evangelism Fellowship of MD, Inc. v. Montgomery Cty. Pub. Sch., 457 F.3d 376 (4th Cir. 2006). There, a religious organization filed suit against a public school district, seeking an injunction to compel the school district to grant the religious organization the right to participate in the district's back-to-school night, open house, and bulletin board forum. Id. at 418-19. The school district revised its policy, allowing the religious organization access to the district's back-to-school night, open house, and bulletin boards. Id. at 423-24. In light of the policy change, the court found that the religious organization's injunction for access to the above forums was moot because the policy change allowed for the desired access and there wasn't any evidence that the district was likely to change the policy back as to exclude the religious organization or similarly situated organizations, from full access. Id.

In the case at bar, the Plaintiffs' need for preliminary injunctive relief is moot. Both the Town of Vernon and Town of Farmington have resumed their fingerprinting services. See Affidavits of Melanson Exhibit 1, and Kenny Exhibit 2, and Plaintiffs Coll, Jones, and Skilton are free to make appointments to obtain their desired fingerprints if

6

they have not obtained them already. The temporary suspension of fingerprinting

services is not likely to recur in the future. The suspension resulted from a once-in-a-

century global pandemic. Accordingly, any claim for injunctive relief is moot and

Plaintiffs' Motion for Preliminary Injunction should be denied.

### C. Plaintiffs' Motion For Preliminary Injunction Must Be Denied Because Plaintiffs Cannot Demonstrate Irreparable Harm

"To satisfy the irreparable harm requirements, Plaintiffs must demonstrate that

absent a preliminary injunction they will suffer an injury that is neither remote nor

speculative, but actual and imminent, and one that cannot be remedied if a court waits

until the end of trial to resolve the harm." Grand River Enter. Six Nations, Ltd. V. Pryor,

481 F.3d 60, 66-67 (2d Cir. 2007) (citation and internal quotation marks omitted).

The plaintiffs were not irreparably harmed simply because they experienced a

delay in obtaining their fingerprints, which ostensibly will result in a concomitant delay in

obtaining their desired handgun permit. Their right to bear arms has never been

questioned or challenged as a result of this delay, and there is no guarantee that

Plaintiffs will meet the ultimate requirements to obtain their desired permits. Finally,

irreparable harm cannot flow from a regulatory process that was necessitated by the

global pandemic, where the Supreme Court has held that reasonable regulation of

liberties protected by the Constitution is allowed in times of public health emergencies.

See Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11 (1905).

### D. Plaintiffs Cannot Demonstrate A Likelihood Of Success On The Merits Of A Second Amendment Claim

After the Supreme Court's decision in Washington D.C. v. Heller, 554 U.S. 570

(2008), the Second Circuit "adopted a two-step inquiry for determining the

constitutionality of firearm restrictions." New York State Rifle & Pistol Ass'n, Inc. v. City of New York, 883 F.3d 45, 55 (2d Cir. 2018), cert. granted sub nom. New York State Rifle & Pistol Ass'n, Inc. v. City of New York, N.Y., 139 S. Ct. 939, 203 L. Ed. 2d 130 (2019), and vacated and remanded sub nom. New York State Rifle & Pistol Ass'n, Inc. v. City of New York, New York, 140 S. Ct. 1525 (2020) (internal quotation marks omitted); see generally Kachalsky v. Cty. of Westchester, 701 F.3d 81 (2d Cir.2012); United States v. Decastro, 682 F.3d 160 (2d Cir.2012). The first step is to "determine whether the challenged legislation impinges upon conduct protected by the Second Amendment." New York State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 254 (2d Cir. 2015). If the challenged legislation is found to impinge upon Second Amendment rights, the second step is to "determine and apply the appropriate level of scrutiny." Id. at 257.

The Second Circuit has recognized two forms of scrutiny to apply in Second Amendment cases—strict and intermediate. New York State Rifle & Pistol Ass'n, Inc., 883 F.3d at 55. When determining whether a heightened scrutiny should apply, two factors are considered: "(1) how close the law comes to the core of the Second Amendment right and (2) the severity of the law's burden on the right." New York State Rifle & Pistol Ass'n, Inc., 804 F.3d at 258. If the law implicates neither "the core protections of the Second Amendment nor substantially burden their exercise do not receive heightened scrutiny." Id. "[A] statute can implicate the core of the Second Amendment's protections by extending into the home, where the need for defense of self, family and property is most acute." New York State Rifle & Pistol Ass'n, Inc., 883 F.3d at 56. See Ezell v. City of Chicago, 651 F.3d 684, 703 (7th Cir. 2011); Heller, 554

U.S. at 628. "[H]eightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in Heller) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)." Decastro, 682 F.3d at 166. This rationale has varying degrees of support in other Circuits. Id. See Nordyke v. King, 644 F.3d 776, 786 (9th Cir.) ("[O]nly regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny under the Second Amendment."), reh'g in banc granted, 664 F.3d 774 (9th Cir.2011); see also Heller, 670 F.3d at 1253 (laws that have only a "de minimis" effect on the right to bear arms or that do not "meaningfully affect individual self-defense" do not impinge on the Second Amendment right and therefore do not warrant heightened scrutiny (internal quotation marks omitted)); cf. Ezell, 651 F.3d at 708 (holding that "a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end" but that "laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified"); United States v. Masciandaro, 638 F.3d 458, 470 (4th Cir.) (endorsing a sliding scale approach to determining the level of scrutiny applicable to laws that burden Second Amendment rights depending in part on "the extent to which [Second Amendment] interests are burdened by government regulation"), cert. denied, —— U.S. ——, 132 S.Ct. 756, 181 L.Ed.2d 482 (2011); United States v. Marzzarella, 614 F.3d 85, 94–95 (3d Cir.2010) (suggesting that a "de minimis" burden on the right to keep arms for self-defense might not warrant heightened scrutiny), cert. denied, —— U.S. ——

–, 131 S.Ct. 958, 178 L.Ed.2d 790 (2011). "[A]pplying less than strict scrutiny when the regulation does not burden the core protection of self-defense in the home makes eminent sense in this context." <u>Kachalsky</u>, 701 F.3d at 93.

"The practice of applying heightened scrutiny only to laws that burden the Second Amendment right *substantially* is, as we noted in *Decastro,* broadly consistent with our approach to other fundamental constitutional rights, including those protected by the First and Fourteenth Amendments." <u>New York State Rifle & Pistol Ass'n, Inc.</u>, 804 F.3d at 259 (internal quotation marks omitted) (emphasis in original).

"The right to marry is fundamental, but reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship are not subject to the rigorous scrutiny that is applied to laws that interfere directly and substantially with the right to marry." <u>Decastro</u>, 682 F.3d at 167 (internal quotation marks omitted) (citing <u>Zablocki v. Redhail</u>, 434 U.S. 374, 386–87 (1978)). "The right to vote is fundamental, but the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." <u>Id</u>. (Internal quotation marks omitted) (citing <u>Burdick v. Takushi</u>, 504 U.S. 428, 434 (1992); <u>see also</u> <u>Rosario v. Rockefeller</u>, 410 U.S. 752, 757–60 (1973) (upholding a law conditioning the right to vote in primaries, because the restriction imposed a time limitation that was not "so severe as itself to constitute an unconstitutionally onerous burden on the petitioners' exercise of the franchise").

This Circuit has willingly "consult[ed] principles from other areas of constitutional law, including the First Amendment" in determining "whether a law substantially burdens Second Amendment rights." <u>Decastro</u>, 682 F.3d at 167. <u>See</u> <u>Heller</u>, 554 U.S. at 582,

595, 635, 128 S.Ct. 2783 (analogizing to First Amendment doctrine); see also Ezell, 651 F.3d at 702–04 (drawing parallels from the First Amendment context to analyze Second Amendment claims); Marzzarella, 614 F.3d at 89 & n. 4 (looking to the structure of the First Amendment for guidance in evaluating Second Amendment challenges).

"The scope of the legislative restriction and the availability of alternatives factor into our analysis of the degree to which the challenged law burdens the right. No substantial burden exists—and hence heightened scrutiny is not triggered—if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense." New York State Rifle & Pistol Ass'n, Inc., 804 F.3d at 259 (internal quotation marks omitted).

"Even where heightened scrutiny is triggered by a substantial burden, however, strict scrutiny may not be required if that burden does not constrain the Amendment's core area of protection. Thus, the two factors interact to dictate the proper level of scrutiny." New York State Rifle & Pistol Ass'n, Inc., 883 F.3d at 56 (internal citation and quotation marks omitted). Intermediate scrutiny may apply "if a challenged law does not implicate a core Second Amendment right, or does not place a substantial burden on the Second Amendment right." Jackson v. City & Cty. of San Francisco, 746 F.3d 953, 961 (9th Cir. 2014).

"Unlike strict scrutiny review, we are not required to ensure that the legislature's chosen means is narrowly tailored or the least restrictive available means to serve the stated governmental interest." Kachalsky, 701 F.3d at 97 (internal quotation marks omitted). "To survive intermediate scrutiny, the fit between the challenged regulation need only be substantial, not perfect." Id. (Internal quotation marks omitted).

1.  **The Executive Order Does Not Impinge On The Plaintiffs' Second Amendment Rights**

The Second Amendment provides that "the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. "[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." McDonald v. City of Chicago, Ill., 561 U.S. 742, 778 (2010). "The Second Amendment protects only 'the sorts of weapons' that are (1) 'in common use' and (2) 'typically possessed by law-abiding citizens for lawful purposes.'" New York State Rifle & Pistol Ass'n, Inc., 804 F.3d at 254–55 (footnote omitted) (citing Heller, 554 U.S. at 625).

Regulations that have been found to violate the Second Amendment are found to implement some sort of absolute ban.

In Heller, the challenged ordinances in effect (1) completely banned possession of handguns, and (2) required long guns that we kept in the home to be "unloaded and dissembled or bound by a trigger lock or similar device." 554 U.S. at 574-75. The Court ultimately held that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family, would fail constitutional muster." Id. at 628-29. (Footnote, citations, and internal quotations omitted).

In Ezell, the plaintiffs challenged the ban on firing ranges within the City of Chicago. 651 F.3d at 704. The Court acknowledged that "the right to possess firearms

for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective. Id. The Court continued, ruling that the ban on firing ranges "is not merely regulatory; it *prohibits* the law-abiding, responsible citizens of Chicago from engaging in target practice in the controlled environment of a firing range," and therefore was "a serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." Id. at 708 (internal quotation marks omitted) (emphasis in original).

Unlike in Heller and Ezell, Defendant Lamont's Executive Order 7E was not seeking a permanent ban on firearm applications or fingerprinting for those applications. The result of the executive order was a temporary ban on fingerprinting for public health purposes due to the CoVid-19 epidemic. Thus, as applied to the case at bar, the executive order does not violate a core protection of Second Amendment rights. It is a temporary suspension of fingerprinting for firearm applications, brought on by a once-in-a-century epidemic, where the leaders of our state, country, and countries around the world, have implemented measures to reduce human interaction on the advice of medical professionals in an attempt to prevent the spreading of this disease for which a cure does not exist. The executive order does not prohibit the ownership of handguns, nor does it ban firing ranges. Accordingly the Executive Order and actions of the Towns of Farmington and Vernon did not impinge on Second amendment rights.

2.  **Even If The Executive Order Is Deemed To Impinge On Second Amendment Rights, It Does Not Substantially Burden Core Second Amendment Protections**

The executive order does not substantially burden second amendment rights.

"[A] law that regulates the availability of firearms is not a substantial burden on the right to keep and bear arms if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense." Decastro, 682 F.3d at 168; See Nordyke, 644 F.3d at 787–88; see also Heller, 554 U.S. at 626–27 (identifying as presumptively lawful "laws imposing conditions and qualifications on the commercial sale of arms").

There are many examples of reasonable regulation not being deemed to be a substantial burden on Second Amendment rights.  The statute in Jackson, supra, regulated how residents in San Francisco were to store their handguns when they weren't carrying them on their body. 746 F.3d at 964. This statute imposes a burden only on the "*manner* in which persons may exercise their Second Amendment rights," United States v. Chovan, 735 F.3d 1127, 1138 (9th Cir. 2013), so therefore, "the regulation more closely resembles a content-neutral speech restriction that regulates only the time, place, or manner of speech." Jackson, 746 F.3d at 964. The statute does not require San Francisco residents to secure their handguns while carrying them, nor does it prevent them from "us[ing their] handguns to defend their home while carrying them on their person." Id. Therefore, the statute does not impose the type of substantial burden that requires a higher level of scrutiny to be applied. Id. Similarly, a ban of a specific type of ammunition within San Francisco City limits does not constitute a substantial burden on the Second Amendment because there are other available avenues to purchase the ammunition in question, such as by travelling outside the City

14

limits to purchase the specific ammunition. <u>Jackson v. City & Cty. of San Francisco</u>, No. C 09-2143 RS, 2012 WL 12888368, at *4 (N.D. Cal. Nov. 26, 2012), <u>aff'd,</u> 746 F.3d 953 (9th Cir. 2014).

In <u>New York State Rifle & Pistol Ass'n, Inc.</u>, the plaintiffs alleged a Second Amendment violation over New York and Connecticut statutes that banned high capacity magazines or magazines that contain more than ten rounds. 804 F.3d at 249. The statutes also prohibited any semiautomatic firearm that contains any military-style feature, including any of the following: "a telescoping stock, a conspicuously protruding pistol grip, a thumbhole stock, a bayonet mount, a flash suppressor, a barrel shroud, and a grenade launcher." <u>Id</u>. The Court differentiated these statutes from the total ban of handguns in <u>Heller</u>, because New York and Connecticut "have not banned an entire class of arms." <u>New York State Rifle & Pistol Ass'n, Inc.</u>, 804 F.3d at 260. Instead, both New York and Connecticut have banned "only a limited subset of semiautomatic firearms, which contain one or more enumerated military-style features." <u>Id</u>. Both states still allow their citizens to "arm themselves with non-semiautomatic weapons *or* with any semiautomatic gun that does not contain any of the enumerated military-style features." <u>Id</u>. (Emphasis in original). The Court acknowledged that the statute imposed a burden that is "real, but it is not severe" and therefore applied intermediate scrutiny. <u>Id</u>. (Internal quotation marks omitted).

In <u>Silvester v. Harris</u>, California's 10-day waiting period to take possession of a firearm is being challenged as a Second Amendment violation. 843 F.3d 816, 827 (9th Cir. 2016). The Court acknowledged that the waiting period regulation "does not prevent, restrict, or place any conditions on how guns are stored or used after a

purchaser takes possession." Id. It does not place any requirements on how the firearm is to be stored when it is not being carried, and it does not prevent any individual from owning a firearm. Id. See Jackson, 746 F.3d at 963; see also Chovan, 735 F.3d at 1139. Further, the Court explores the historical aspect of having to wait for the delivery of a weapon. Silvester, 843 F.3d at 827. "Before the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one. As a purely practical matter, delivery took time. Our 18th and 19th century forebears knew nothing about electronic transmissions. Delays of a week or more were not the product of governmental regulations, but such delays had to be routinely accepted as part of doing business." Id. The Court concluded that the 10-day waiting period did not place a substantial burden on a Second Amendment right.

As applied to the case at bar, the executive order does not substantially burden Second Amendment rights. In Connecticut, in order to acquire a State Permit to Carry Pistols and Revolvers, a Connecticut state resident must first obtain a Local Permit. The application and background check involved in obtaining a Local Permit typically takes eight weeks, and the applicant must be informed within eight weeks if the applicant's request has been approved or denied. See C.G.S. section 29-28a(b). The executive order suspending fingerprinting is effectively just a delay in processing an application. Case law supports that waiting periods and other measures that regulate the manner in which an individual may exercise their Second Amendment rights is not a substantial burden on Second Amendment rights. Thus, if the Executive Order is deemed to impinge on Second Amendment rights, it should be analyzed under intermediate scrutiny.

16

### E. **The Actions Of The Towns Of Farmington And Vernon Survive Intermediate Scrutiny**

When dealing with a government regulation, the regulation is justified if (1) it is within the constitutional power of the government; (2) it furthers an important or substantial government interest; (3) the government interest is unrelated to the suppression of firearm ownership; and (4) the restriction is not greater than is essential to the furtherance of the government interest. See United States v. O'Brien, 391 U.S. 367, 376–77 (1968).

In applying the O'Brien factors, the regulation in question is Executive Order 7E, specifically,  the temporary suspension of fingerprinting for firearms certificates and permits. Defendant Lamont unquestionably had the power to issue executive orders declaring Public Health and Civil Preparedness Emergencies pursuant to CGS §§ 19a-131a and 28-9.

Regarding the second O'Brien factor, the executive order furthers an important or substantial government interest, the safety, health, and welfare of the general public. In Jacobson, the Massachusetts legislature required the inhabitants of a city or town to be vaccinated only after the Board of Health determined it to be necessary for public health or public safety. 197 U.S. at 27. The Jacobson Court recognized the substantial interest the government has in protecting public safety during a pandemic. See Jacobson, 197 U.S. at 29.

Regarding the third O'Brien factor, the executive order is unrelated to the suppression of firearm ownership because it does not call for citizens to turn in their firearms, it does not restrict the ability to carry a firearm in public or to use it in self-defense or in defense of a home. Instead, the executive order is related to the control of

17

a once-in-a-century disease from spreading across the state of Connecticut and the United States. The disease has been found to spread from human-to-human interaction, and the executive order is designed to limit that interaction. The extensive preamble to the Executive Order makes clear the intention of the State of Connecticut, acting through its chief executive, Governor Lamont, was to address the pandemic and not to limit access to, or use of, firearms.

Regarding the fourth O'Brien factor, the restrictions imposed by the executive order are not greater than is essential to the furtherance of the government interest of the safety, health, and welfare of the general public because the temporary fingerprinting suspension, was just that—temporary—and  has already been lifted. See Affidavits of Melanson, Exhibit 1 and Kenny, Exhibit 2. The temporary suspension is much less restrictive than other provisions which have been upheld after the Supreme Court's decision in Heller, including absolute bans regarding firearm possession for entire classes of people. See United States v. Barton, 633 F.3d 168 (3d Cir.2011) (holding that defendant's conviction for being a felon in possession of a firearm and ammunition did not violate his Second Amendment rights); United States v. Scroggins, 599 F.3d 433, 451 (5th Cir.2010) (same); United States v. Rozier, 598 F.3d 768, 771 (11th Cir.2010) (same); United States v. McCane, 573 F.3d 1037, 1047 (10th Cir.2009) (same); United States v. Yancey, 621 F.3d 681 (7th Cir.2010) (upholding statute prohibiting gun possession by illegal drug users); United States v. White, 593 F.3d 1199, 1205–06 (11th Cir.2010) (holding that Second Amendment was not violated by statutory prohibition against possession of firearms by persons convicted of misdemeanor crime of domestic violence). But see Britt v. State, 363 N.C. 546, 681

S.E.2d 320, 323 (2009) (finding that a felon convicted in 1979 of one count of possession of a controlled substance with intent to distribute had a constitutional right to keep and bear arms under the North Carolina Constitution). Accordingly, Plaintiffs cannot demonstrate a likelihood of success on their Second Amendment claim, and their Motion for Preliminary Injunction should be denied.

### F.  Plaintiffs Cannot Demonstrate A Likelihood Of Success On A Due Process Claim

Plaintiffs' due process claim fails for two reasons. First, the Supreme Court has held that where a particular Amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." Albright v. Oliver, 510 U.S. 266, 273, (1994); citing Graham v. Connor, 490 U.S. 386, 395 (1989). Plaintiffs have alleged particularized claims under the Second Amendment, as well as the Equal Protection clause and Privileges and Immunities clause of the Fourteenth Amendment, thus, a due process claim is not viable.

Second, Plaintiffs' due process claim fails because of Plaintiffs inability to meet the Second Circuits' "strict entitlement" test. To state a substantive due process claim based on the denial of the building permit, Plaintiffs "must allege, first, that [they] possessed a 'valid property interest' – that is, a property interest 'protected' within the meaning of the Fourteenth Amendment – and, second, that Defendants infringed upon that interest in an arbitrary or irrational manner." Stahl York Ave. Co., LLC v. City of N.Y., No. 14 CIV. 7665 (ER), 2015 WL 2445071, at *13 (S.D.N.Y. May 21, 2015). With

respect to the first requirement, the Second Circuit applies "a strict 'entitlement' test to determine whether a party's interest ... is protectable under the Fourteenth Amendment." Zahra v. Town of Southold, 48 F.3d 674, 680 (2d Cir. 1995).

Under that test, "'to establish a federally protectable property interest in a state or local permit,' a plaintiff must demonstrate that 'there was no uncertainty regarding his entitlement to it under applicable state or local law, and [that] the issuing authority had no discretion to withhold it in his particular case.'" Stahl York Ave. Co., LLC v. City of New York, No. 14 CIV. 7665 ER, 2015 WL 2445071, at *13 (S.D.N.Y. May 21, 2015), aff'd, 641 F. App'x 68 (2d Cir. 2016) (quoting Natale v. Town of Ridgefield, 170 F.3d 258, 263 n.1 (2d Cir. 1999)); see also Clubside, Inc. v. Valentin, 468 F.3d 144, 154 (2d Cir.2006) ("[O]ur precedent makes clear that the analysis of whether a landowner has a protectable property interest in a particular land use benefit focuses on the degree of official discretion and not on the probability of its favorable exercise.") (internal quotation marks and citations omitted). "[I]n almost all cases, the existence of a federally protectable property right is an issue of law for the court," Cunney v. Bd. of Trustees of Vill. of Grand View, 56 F. Supp. 3d 470, 494 (S.D.N.Y. 2014) (internal quotation marks and citations omitted), "[b]ecause the focus of this inquiry is on the degree of the issuing agency's official discretion," DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 132 (2d Cir. 1998). As to the second requirement, the "arbitrary or irrational" standard is met only where "official conduct [is] outrageous and egregious under the circumstances." Lombardi v. Whitman, 485 F.3d 73, 81 (2d Cir. 2007); see also Ruston v. Town Bd. for Town of Skaneateles, No. 5:06-CV-927 (FJS/GHL), 2008 WL 5423038, at *5 (N.D.N.Y. Dec. 24, 2008) ("Substantive due

process is an outer limit on governmental action; therefore, it does not forbid arbitrary and capricious conduct correctable in a state-court review of an administrative action.").

Based on the Governor's executive order 7E, suspending the applicability of Conn Gen. Stat. Sec. 29-17a, Plaintiffs can make no claim of entitlement to be fingerprinted, given the Governor's Executive Order 7E. Furthermore, the refusal by the Towns of Farmington and Vernon to fingerprint during the temporary public health emergency, as a matter of law, is not arbitrary capricious or irrational. Accordingly, the Plaintiffs' Motion for Preliminary Injunction should be denied.

### G. Plaintiffs Cannot Demonstrate A Likelihood Of Success On An Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment provides that a state shall not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Constitution, amend. XIV, § 1. Two claims exist arising from a violation of the Equal Protection Clause: (1) a selective enforcement claim; and (2) a "class-of-one" claim. "To prevail on a claim of selective enforcement, plaintiffs in this Circuit traditionally have been required to show both (1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001); accord AYDM Assocs., LLC v. Town of Pamelia, 205 F. Supp. 3d 252, 265 (N.D.N.Y. 2016) (D'Agostino, J.). For a selective enforcement claim, the plaintiff must identify comparators who are "roughly equivalent" but there need not be an exact correlation between the plaintiff and the

comparators. <u>AYDM Assocs., LLC</u>, 205 F. Supp. 3d at 265. By comparison, a class-of-one claim can be brought where "a plaintiff is intentionally treated differently from others similarly situated and 'there is no rational basis for the difference in treatment.' " <u>Id</u>. at 268 (quoting <u>Vill. of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000)). For a class-of-one claim, the plaintiff must "show an extremely high degree of similarity between themselves and the persons to whom they compare themselves," such that "the plaintiff and the comparator must be '*prima facie* identical in all relevant respects.' " <u>AYDM Assocs., LLC</u>, 205 F. Supp. 3d at 268.

Plaintiffs have not identified a single comparator who was similarly situated in all material respects, but were treated differently by the Towns of Vernon or Farmington, and certainly cannot meet the high standard for a class-of-one equal protection claim of being in prima facie identical circumstances as one another but was treated differently by the Towns of Vernon or Farmington. The fact that every one of the Plaintiffs were treated the same with respect to being refused the Towns' fingerprinting service makes this point. Accordingly, Plaintiffs' Motion for Preliminary Injunction should be denied.

## H. <u>Plaintiffs Cannot Demonstrate A Likelihood Of Success On A Privileges And Immunities Clause Claim</u>

The Privileges and Immunities Clause states that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1. The Clause operates to "place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those states are concerned." <u>Paul v. State of Virginia</u>, 75 U.S. 168, 180, 19 L. Ed. 357 (1868), <u>overruled in part by</u> <u>United States v. S.-E. Underwriters Ass'n</u>, 322 U.S. 533, 64 S. Ct. 1162, 88 L. Ed. 1440 (1944); <u>see</u> <u>Bach v. Pataki</u>, 408 F.3d 75, 88

(2d Cir.2005), overruled on other grounds by McDonald v. City of Chicago, Ill., 561 U.S.

742 (2010). In short, the Clause does not demand that a citizen of one State be allowed

to carry with him into another state the privileges and immunities which come with

citizenship in his state. Rather, it guarantees "that in any State every citizen of any other

State is to have the same privileges and immunities which the citizens of that State

enjoy." Baldwin v. Fish & Game Comm'n of Mont., 436 U.S. 371, 382 (1978) (internal

quotation marks omitted). It is toward that end that the Clause "prevents a State from

discriminating against citizens of other States in favor of its own." Id. (internal quotation

marks omitted).

    The Privileges and Immunities Clause, however, is "not an absolute" that

precludes states from ever distinguishing between citizens and noncitizens. Supreme

Court of Va. v. Friedman, 487 U.S. 59, 67 (1988); see Baldwin, 436 U.S. at 383

(collecting cases and observing that state need not "always apply all its laws or all its

services equally" to citizens and noncitizens). To prevail on a Privileges and Immunities

challenge, a plaintiff must demonstrate that the state has burdened nonresident activity

that is "sufficiently basic to the livelihood of the Nation as to fall within the purview of the

Privileges and Immunities Clause." Supreme Court of Va., 487 U.S. at 64 (internal

quotation marks and alterations omitted). Upon such a showing, the state may defend

its position by demonstrating that "substantial reasons exist for the discrimination and

the degree of discrimination bears a sufficiently close relation to such reasons." Id. at

67; accord Connecticut ex rel. Blumenthal v. Crotty, 346 F.3d 84, 94 (2d Cir. 2003). A

court necessarily conducts these inquiries in light of the Supreme Court's recent

admonition that constitutionally protected privileges and immunities are burdened "only

23

when [challenged] laws were enacted for [a] protectionist purpose." <u>McBurney v. Young</u>, 569 U.S. 221, 227 (2013).

It is undisputed that the Privileges and Immunities clause does not apply to the case at bar. Such a claim would only be plausible it a Town in Connecticut took the position that is would allow a Connecticut resident to have certain privileges but deny those privileges to a resident of New York or some other state. All Plaintiffs are from Connecticut and this claim necessarily will fail. Accordingly, the Plaintiffs' Motion for Preliminary Injunction should be denied.

## I. **Plaintiffs' Motion For Preliminary Injunction Must Be Denied Because The Balance Of Hardships And Public Interest Do Not Tip In Plaintiffs' Favor**

The final two factors of a preliminary injunction analysis—the balance of hardships and the public interest—merge when the Government is the opposing party, as is present in this case. <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009).

For the plaintiffs to succeed under the higher standard for a preliminary injunction applicable to this case, "the balance of hardships between the plaintiff and defendant" must "tip in the plaintiff's favor." <u>Salinger</u>, 607 F.3d at 80. Also, "the court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction." <u>Id</u>. (Internal quotation marks omitted). The public interest consideration is applicable to all aspects of the analysis; "[w]henever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." <u>Brody v. Vill. of Port Chester</u>, 261 F.3d at 290-91 (quotation marks omitted). "Otherwise a claim that appears

meritorious at a preliminary stage but is ultimately determined to be unsuccessful will have precipitated court action that might needlessly have injured the public interest." Id. (quotation marks omitted).

The balance of hardships and the interests of justice clearly tip in favor of the Towns, and the denial of injunctive relief.  The Towns' action was legal and sanctioned by State Government.  The State in turn made its judgments based on the opinions of experts in the fields of epidemiology, immunology, and public health, on the issue of how best to combat this once-in-a-century epidemic. Opinion was universal that a scenario existed where the taking of no action could result in the loss of millions of lives. The action taken in suspending the fingerprinting service was sensibly targeted toward the statewide effort to keep the public from moving in and out of public buildings. Ultimately, the burden associated with the temporary suspension of a permitting process easily is justified as compared to the benefit associated with the saving of lives.

## IV.   **CONCLUSION**

For the reasons set forth above the Plaintiffs' Motion for Preliminary Injunction should be denied..

DEFENDANTS,
PAUL MELANSON AND JAMES KENNY
By  /s/ Thomas R. Gerarde
  Thomas R. Gerarde
  ct05640
  Howd & Ludorf, LLC
  65 Wethersfield Avenue
  Hartford, CT  06114
  (860) 249-1361
  (860) 249-7665 (Fax)
  E-Mail:  tgerarde@hl-law.com

## <u>CERTIFICATION</u>

This is to certify that on May 21, 2020, a copy of the foregoing Memorandum of Law in Opposition of Plaintiffs' Motion for Temporary Injunction was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Craig C. Fishbein
Fishbein Law Firm, LLC
100 South Main Street
Wallingford, CT 06492

Doug Dubitsky, Esq.
Law Offices of Doug Dubitsky
P.O. Box 70
North Windham, CT 06256

DeAnn S. Varunes
Attorney General's Office - Sherman St (Htfd)
110 Sherman St.
Hartford, CT 06105

Matthew B. Beizer
Attorney General's Office
MacKenzie Hall
110 Sherman St.
Hartford, CT 06105-2294

John Paul Marini
Marino, Zabel & Schellenberg, PLLC
657 Orange Center Rd
Orange, CT 06401

James Newhall Tallberg
Patrick D Allen
Karsten & Tallberg LLC
500 Enterprise Drive, Suite 4B
Rocky Hill, CT 06067

                    /s/ Thomas R. Gerarde
                    Thomas R. Gerarde