UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CONNECTICUT CITIZENS DEFENSE | : | CIV. NO.3:20-cv-00646(JAM) |
| LEAGUE, INC., AMY JONES, TODD | : | |
| SKILTON, JOHN LOWMAN, JOSEPH | : | |
| COLL, TANYSHA BROWN, AND | : | |
| DANIEL GERVAIS, | : | |
|      Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| NED LAMONT, JAMES ROVELLA, | : | |
| PAUL MELANSON, ANDREW COTA, | : | |
| BRIAN GOULD AND JAMES KENNY, | : | MAY 21, 2020 |
|      Defendants. | | |

**BRISTOL POLICE CHIEF BRIAN GOULD
AND ANSONIA POLICE CHIEF ANDREW COTA'S
OBJECTION TO PLAINTIFFS' MOTION FOR TEMPORARY
RESTRAINING ORDER AND INJUNCTION**

Plaintiffs have filed a motion and supporting memorandum of law seeking a temporary

restraining order and preliminary injunction staying enforcement of, inter alia, Executive Order No. 7E,

issued on March 17, 2020 by Governor Ned Lamont, which suspended the requirement that municipal

law enforcement agencies must provide fingerprinting services for the public.  Pls.' Mot. TRO, May 9,

2020, [Docs. 3-4] (hereinafter "Pls.' TRO.").  Plaintiff, Tanysha Brown, has alleged that she was denied

the ability to submit an application for a pistol permit and have her fingerprints taken at the Bristol

Police Department ("BPD") and Plaintiff, John Lowman, has alleged that he was similarly denied the

right to have his fingerprints collected at the Ansonia Police Department ("APD").  Plaintiffs' request

must be denied as to Defendants, Bristol Police Chief Brian Gould and Ansonia Police Chief Andrew

Cota, because: (1) it is moot in light of the fact that the BPD and APD have both already scheduled

appointments with Ms. Brown and Mr. Lowman to have their fingerprints taken; (2) plaintiffs have not

demonstrated irreparable harm; (3) plaintiffs have not shown a clear or substantial likelihood of success on the merits; and (4) the relief plaintiffs request is directly adverse to the public interest.

## I.   OVERVIEW

Familiarity with the global pandemic COVID-19 virus (coronavirus) is assumed.[1]  Over the past few months, large swaths of the American economy have ground to a halt as citizens have sheltered in place, hoping to flatten the staggering curve, measured in terms of human death caused by a highly contagious virus that does not presently have a cure.

Every day, the number of people infected with COVID-19 continues to rise, along with the virus's death toll.  As of May 20, 2020, testing has revealed 1,477,459 cases in the United States with 89,271 COVID-19 associated deaths.[2]  According to the State of Connecticut COVID-19 portal, there are 39,017 confirmed cases in Connecticut, with 3,529 COVID-19 associated deaths and 887 currently hospitalized.[3]  Connecticut is at the COVID-19 epicenter in the United States, due to its proximity to New York.  See Elizabeth Williamson and Kristen Hussey, *Party Zero: How a Soiree in Connecticut Became a 'Super Spreader,'* N.Y. Times, Mar. 23, 2020 (describing the rapid person to person spread of COVID-19 in the Town of Westport).

This Court has not been spared.  Between March 11, 2020 and May 19, 2020, Chief Judge for the District of Connecticut Stephan R. Underhill issued at least seventeen (17) COVID-19 related General

---

[1]  On March 13, 2020, the President of the United States declared a National Emergency concerning COVID-19. Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 13, 2020).  According to the World Health Organization's website, as of May 20, 2020, there were 4,789,205 confirmed cases of COVID-19 worldwide, with 318,789 confirmed COVID-19 associated deaths and 215 countries and territories impacted.  See Coronavirus Disease (COVID-19) Pandemic, World Health Org., https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited May 20, 2020).
[2]  Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Cases in the US, (last updated May 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.
[3]  See https://portal.ct.gov/coronavirus (last visited May 20, 2020).

Orders that:  1) suspend all civil and criminal jury selections and jury trials; 2) restrict visitor access to courthouses; 3) suspend in-person civil and criminal court proceedings; 4) suspend probation compliance review hearings; 5) require screening by body temperature of criminal detainees scheduled to appear in court; 6) require the use of video conferencing, where feasible, or teleconferencing in the alternative; 7) suspend courtesy copy requirements; 8) close the District Court Clerk's Office to the general public, and 9) allow for appointment of pro bono counsel to represent the flood of inmates seeking compassionate release due to COVID-19 concerns.  See General Orders In Re Court Operations Under The Exigent Circumstances Created By COVID-19, March 11, 2020 to May 19, 2020.[4]

This week is a critical juncture for Connecticut, with a gradual easing of the COVID-19 restrictions, and certain business sectors opening on May 20 under modified public health rules.  See *Sector Rules and Certification for May 20th Reopen:* https://portal.ct.gov/DECD/Content/Coronavirus-Business-Recovery/Sector-Rules-for-May-20-Reopen.  Connecticut's law enforcement agencies are similarly endeavoring to reopen services to the public, including fingerprinting services.  See Decl. of Brian Gould, May 21, 2020, ¶¶ 13-14 (Ex. 1); Decl. of Andrew Cota, May 21, 2020, ¶¶ 19-20 (Ex. 2).

Just as the District Court this very week extended the suspension of all civil and jury trials until September 1, 2020; see General Orders In Re Court Operations Under The Exigent Circumstances Created By COVID-19, May 19, 2020; and imposed a new requirement that  all persons entering the courthouse wear a mask, the police chiefs sued in this case are similarly working diligently to resume the performance of services offered to the public, including fingerprinting for background checks and

---

[4] Most recently, by a General Order issued May 19, 2020, Judge Underhill ordered that "effective immediately and until further order . . . all persons entering a federal courthouse in this District . . . shall wear a mask that is effective to prevent the spread of the COVID-19 virus."  General Order In Re: Court Operations Under the Exigent Circumstances Created by Covid-19, May 19, 2020.

temporary pistol permits.  Yet, plaintiffs have rushed to federal court seeking judicial relief because their request to be fingerprinted was temporarily delayed.  As set forth more fully below, plaintiffs' request to have this Court intervene with injunctive relief is wholly unnecessary, without proper legal foundation, and should be denied.

## II.    RELEVANT FACTS AND PLAINTIFFS' ALLEGATIONS

### A.    Connecticut's Response To COVID-19

On March 10, 2020, in response to the COVID-19 public health crisis, Governor Lamont issued a Declaration of Public Health and Civil Preparedness Emergency (the "COVID-19 Declaration").[5]  In so doing, Governor Lamont invoked the state's response under Connecticut General Statutes § 19a-131a(f) to this public health emergency and authorized the Commissioner of Public Health to "delegate powers regarding isolation or quarantine to municipal and district directors of public health."  Id. Governor Lamont also provided this guidance to local officials:

> Municipalities, local health officials, and local education officials are directed to follow previously issued guidance and apply relevant principals of risk management to decisions about whether to cancel, modify or postpone large gatherings, public events, or travel.

Id.

After declaring a state of emergency, Governor Lamont issued a series of executive orders implementing strategies recommended by the United States Centers for Disease Control and the Connecticut Department of Public Health to increase containment of the virus and slow down its transmission.  Executive Order 7 at 1 (March 12, 2020).  To date, Governor Lamont has issued forty-four (44) carefully tailored Executive Orders, all of which were designed to mitigate the catastrophic

---

[5] Pursuant to Rule 201(b) of the Federal Rules of Evidence, this Court can take judicial notice of the Executive Orders issued by Governor Lamont.  See https://portal.ct.gov/Coronavirus/Pages/Emergency-Orders-issued-by-the-Governor-and-State-Agencies.

adverse consequences of COVID-19.  <u>See</u> Executive Orders 7 through 7QQ (March 12, 2020 through

May 20, 2020).  Most pertinent to this action, Governor Lamont's Executive Order No. 7E, suspended

the provision in Connecticut General Statutes § 29-17c which prohibits employees of a municipal police

department from refusing to collect fingerprints for the purposes of criminal history check.  Executive

Order No. 7E, March 17, 2020.  In relevant part, the Order provides that:

> The chief of police or Commissioner of Emergency Services and Public Protection or his
> designee, subject to their discretion, may limit or eliminate fingerprinting hours to limit
> the transmission of COVID-19 or focus resources on critical public safety needs.

<u>Id.</u>, Sec. 2.

### B.      Bristol Temporarily Suspends Fingerprinting for Background Checks and Pistol Permits

On March 18, 2020, in response to the COVID-19 public health crisis, and in reliance on

Governor Lamont's Executive Order No. 7E, Bristol Police Chief Brian Gould exercised his lawful

discretion to direct his Operations Commander, Captain Richard Guerrera, to implement public health

protections for BPD employees and members of the public requiring police services.  Gould Decl., ¶ 4

(Ex. 1).  Chief Gould's effort to try to contain the COVID-19 virus, and prevent its spread within the

police headquarters, included a temporary suspension of fingerprinting for background checks and pistol

permits.  <u>Id.</u>  On March 18, 20020, Captain Guerrera issued BPD Bulletin 20-7, *Non-Criminal*

*Fingerprinting Suspension*, (a true and genuine copy of which is attached hereto as Addendum A to Ex.

1), informing BPD staff that, due to the COVID-19 public health crisis, the BPD was temporarily

suspending required fingerprinting availability.  <u>Id.</u>, ¶ 5.  This measure was deemed necessary because

the fingerprinting process takes place inside a secure area of the BPD, which is closed to the public.  <u>Id.</u>,

¶ 6.

A person wishing to have fingerprints taken for a background or temporary pistol permit application would need to pass through the lobby and be admitted into a secure portion of the department in order to be fingerprinted.  Id.  In addition, a person wishing to have fingerprints collected for a background or temporary pistol permit application would necessarily come into physical contact with the BPD officer who would take the fingerprints, which would violate the recommended social distancing protocol under which persons are supposed to remain a safe distance of six feet apart.  Id., ¶ 7.

Also, on or about March 18, 2020, the BPD posted a sign outside the BPD, and on the BPD Facebook page, informing the public that, due to the COVID-19 public health crisis, the BPD was limiting public access to the department's lobby to emergency calls.  Id., ¶ 8.  A true and genuine copy of that sign/Facebook posting is attached hereto as Addendum B to Ex. 1.  Id.  With that sign and Facebook posting, the BPD informed the public that they would not be accepting routine calls for police services at the BPD lobby and would instead require persons visiting the lobby for non-emergency services to call the department's non-emergency telephone line.  Id., ¶ 9.

Although the BPD temporarily suspended fingerprinting availability on March 18, 2020, it continued processing temporary pistol permit applications for applicants who already had been fingerprinted.  Id., ¶ 10.  Chief Gould personally signed approximately 63 handgun permits during the period fingerprinting was temporarily suspended, from March 18, 2020 until the date of this filing, May 21, 2020.  Id., ¶ 11.[6]

---

[6] The only fingerprints taken at the BPD during that timeframe were those of custodial arrestees charged with the most serious offenses.  Gould Decl., ¶ 12.

Consistent with Governor Lamont's phased reopening of the state, on May 20, 2020, the BPD began reopening fingerprinting services for pistol permits and background checks on a limited basis with the implementation of a variety of public health protections, including that they will be done by appointment only.  Id., ¶ 13.  On May 19, 2020, through legal counsel, Chief Gould informed plaintiff, Tanysha Brown, that she should contact BPD Detective Steven Pileski to schedule an appointment to have her fingerprints taken.  Id., ¶ 14.  A true and genuine copy of the letter sent to Ms. Brown's counsel is attached hereto as Addendum C to Ex. 1.[7]

Notably, in cases in which non-firearms related fingerprinting is requested, for example, by a person seeking fingerprints for a background check, the BPD does not retain a copy of the fingerprints taken.  Id., ¶ 15.  Instead, all copies of the fingerprints are returned to the applicant.  Id.  At Chief Gould's direction, a search of the BPD records was conducted and revealed no record that plaintiff Brown was ever fingerprinted by the BPD, or that she ever contacted the BPD seeking to have her fingerprints taken.  Id., ¶ 16.  It is possible that Ms. Brown called the BPD as she has alleged, and that she was previously fingerprinted at the BPD, but the BPD could find no record of such occurrence.  Id., ¶ 17.

### C.   Ansonia Temporarily Suspends Fingerprinting for Background Checks and Pistol Permits

Since the onset of the COVID-19 crisis, the APD had one sworn police officer in its agency test positive for the virus and sixteen other employees (some sworn officers, some civilian staff) who have been quarantined as a result of potential COVID-19 exposure, but who ultimately tested negative.  Cota

---

[7] On the eve of this filing, and after Chief Gould's Declaration was executed, defense counsel was informed that Ms. Brown has been given an appointment at the BPD to have her fingerprints collected on Monday, May 25.

Decl., ¶ 4.  Faced with this dire situation, Police Chief Cota had a duty to ensure the continuation of emergency police services to his community by preventing unnecessary exposure to staff – and the public – to the COVID-19 virus.  Id., ¶ 5.  Beginning on March 11, 2020, Chief Cota began implementing public health protections for APD employees and members of the public requiring police services in an effort to protect staff, and the public they serve, from unnecessary exposure to COVID-19.  Id., ¶ 6.  He issued several Special Orders modifying regular operating procedures for arrests and investigations in response to COVID-19 concerns, including Special Order 1, *Handling Calls for Service During COVID-19 Pandemic*, and Special Order 2, *Arrests During COVID-19 Pandemic* (March 27, 2020).  Id., ¶ 7.  True and genuine copies of these Orders are attached hereto as Addendum A and B to his Declaration (Ex. 2).  Id.,

The intent of these Special Orders was to adhere to safe distancing guidelines to mitigate the spread of the COVID-19 virus.  Id., ¶ 9.   On March 11, 2020, prior to the issuance of Governor Lamont's Executive Order No. 7E, there was confusion concerning whether law enforcement agencies were required to continue fingerprinting for background checks and pistol permits during the COVID-19 crisis.  Id., ¶ 9.  In those early days of the rapidly unfolding crisis (March 11, 2020 to March 17, 2020) the APD briefly suspended, and then resumed, fingerprinting availability for background checks and pistol permits.  Id., ¶ 10.[8]

On or about March 18, 2020, in reliance on Governor Lamont's Executive Order No. 7E, issued March 17, 2020, Chief Cota directed his staff to temporarily suspend required fingerprinting availability.  Id., ¶ 11.  Chief Cota made that decision because the collection of fingerprints takes place inside the

---

[8] No plaintiffs have alleged any claims resulting from this brief interruption in fingerprinting services.

secured booking area of the APD, which is closed to the public.  Id., ¶ 12.  A person wishing to have fingerprints taken for a background or temporary pistol permit application would need to pass through the APD lobby, be escorted down a hallway where they would enter the secured booking area (where criminal suspects are processed) and enter the AAFIS machine room, which is approximately twelve feet by twelve feet.  Id., ¶ 13.

The AAFIS machine is connected to a computer network and cannot be moved to an open air location due to a lack of connectivity.  Id., ¶ 14.  In addition, a person wishing to have fingerprints taken for a background or temporary pistol permit application would necessarily come into physical contact with the APD officer who would collect the fingerprints, which would violate the recommended social distancing protocol under which persons are supposed to remain a safe distance of six feet apart.  Id., ¶ 15.

Although the APD temporarily suspended fingerprinting availability, the APD continued processing temporary pistol permit applications to the extent they could be moved forward without having fingerprints taken.  Id., ¶ 16.  From approximately March 11, 2020 until the date of this filing, May 21, 2020, Chief Cota's designee, Lt. Wayne Williams, signed approximately 35 handgun permits.  Id., ¶ 17.  During the period that the APD temporarily suspended fingerprinting services for background checks and pistol permits, they only fingerprinted for custodial arrests, which fingerprinting takes place in the secured booking area of the APD, and only for the most serious crimes, generally felony offenses.  Id., ¶ 18.

Consistent with Governor Lamont's phased reopening of the state, on May 20, 2020, the APD began reopening fingerprinting services for pistol permits and background checks on a limited basis with the implementation of a variety of public health protections, including that they will be done by

9

appointment only.  Id., ¶ 19.  On May 20, 2020, a member of the APD communicated with plaintiff,

John Lowman, and arranged a time to have his fingerprints taken by the APD, which appointment has

been scheduled for Friday, May 22, 2020, between 1:00 p.m. and 2:00 p.m.  Id., ¶ 20.  A true and

genuine copy of the letter sent to Mr. Lowman's counsel by the City of Ansonia's Corporation Counsel

is attached hereto as Addendum C to Chief Cota's Declaration (Ex. 2).  Id.

> **D.    Allegations of Plaintiffs Lowman and Brown**

On April 13, 2020, Plaintiff Lowman contacted the Ansonia Police Department for the purposes

of having his fingerprints taken to submit with the permit application he intended to file.  Compl., ¶ 33.

Plaintiff Lowman was informed at that time by a representative of Ansonia Police Department that,

"pursuant to Governor Lamont's Executive Order 7E, it was not taking fingerprints from firearms

certificate or permit applicants, and therefore would not accept Plaintiff Lowman's application for a

pistol permit."  Id., ¶ 34. [9]  As described above, the APD was not able to accommodate Mr. Lowman's

request on that date, because it had temporarily suspended fingerprinting pursuant to Governor Lamont's

Executive Order 7E.

On or about April 15, 2020, Plaintiff Brown "contacted the Bristol Police Department for the

purposes of having her fingerprints taken to submit with her application."  Id., ¶ 35.  She was informed

at that time that, due to the issuance of Governor Lamont's Executive Order 7E, the Bristol Police

Department "had suspend[ed] the taking of fingerprints for that purpose, and therefore would not accept

[her] application for a pistol permit."  Id., ¶ 36.  Plaintiff Brown had previously been employed as

---

[9]  Although Mr. Lowman has alleged that he contacted the APD on or about April 13, 2020, seeking to have his fingerprints collected in connection with a pistol permit application, department records indicate that his request was made on April 16, 2020.  Cota Decl., ¶ 21.  Regardless of the date, the fact that he sought to have his fingerprints taken is not disputed.

10

security guard for a bank and, during the application process for that job, she was fingerprinted somewhere for the purposes of a criminal background check.  Id., ¶ 37.  Plaintiffs claim that Brown is not required to re-submit fingerprints for a pistol permit application under C.G.S. § 29-29(b); and that, despite this statutory interpretation, "the Bristol Police Department refused to accept her application." Id.

Plaintiffs Lowman and Brown, "and others similarly situated, desire to, and must be allowed to, purchase and possess firearms, ammunition, and magazines for lawful purposes, and they would but for the reasonable fear and imminent risk of arrest and criminal prosecution under the State's laws imposing criminal sanctions on the transfer of firearms, ammunition, and/or magazines to persons who have not been issued a State-issued firearms certificate or permit."  Id., ¶ 63.[10]

In Count 1, plaintiffs allege a § 1983 claim based on the purported deprivation of their rights under the Second and Fourteenth Amendments "to keep and bear arms," including the "right of individuals to acquire firearms, ammunition, and magazines." Id., Count 1, ¶¶ 69, 70.  In Count 2 plaintiffs allege that the temporary suspension of fingerprinting for purposes of pistol permit applications violated their right to due process.  In Count 3 plaintiffs claim that the brief suspension of fingerprinting violated their Fourteenth Amendment right to equal protection of the laws.  Lastly, in Count 4, plaintiffs claim the suspension of fingerprinting services violated their right to privileges and immunities as American citizens.

---

[10] There is no allegation that plaintiff Lowman, Brown or any other plaintiff seeks to transfer firearms or ammunition to another person who does not have the required certificate or permit, such that they would even potentially be subject to state laws imposing criminal sanctions for such conduct.

III.   **PROCEDURAL BACKGROUND**

Plaintiffs filed their original complaint and subject motion on May 9, 2020.  <u>See</u> Docs. 1, 3.

They filed their operative, first amended complaint ("Compl.") on May 15, 2020.  <u>See</u> Doc. 26.

On May 12, 2020, plaintiffs filed a Proposed Order in connection with their motion which, as to

these defendants, states in pertinent part: "Pending further Order of this Court, the Defendants and all …

municipal departments under the Defendants' authority or direction, are hereby restrained, enjoined and

prohibited from issuing, enforcing, following, or relying on, any order, direction, statement, report, or

pronouncement of Governor Ned Lamont or the executive branch, including, but not limited to

Paragraph 2 of Executive Order 7E, which in any way excuses, limits, diminishes, reduces, or conditions

the duties and/or obligations under the Connecticut General Statutes, including, but not limited to CGS §

29-17c,[11] for state and local law enforcement to fingerprint, and process the applications of, persons who

apply for, or who have applied for, any certificate or permit to obtain, purchase, possess or carry

firearms, ammunition, and/or ammunition magazines."  Pl. Proposed Order, Doc. 12.

IV.   **LEGAL STANDARD**

"In the Second Circuit, [t]he same standards used to review a request for a preliminary injunction

govern consideration of an application for a temporary restraining order."  <u>Anderson v. Williams</u>, No.

3:15-CV-1364 (VAB), 2016 WL 7217588, at *3 (D. Conn. 2016)(citation and internal quotation marks

omitted); <u>see also</u> <u>Local 1814 Int'l Longshoreman's Ass'n v. New York Shipping Assoc., Inc.</u>, 965 F.2d

---

[11] General Statutes § 29-17c (a) provides: "No employee of a municipal police department … shall refuse to collect the fingerprints of a person requesting such fingerprinting for the purposes of a criminal history records check in accordance with section 29-17a…provided (1) such employee's duties include fingerprint collection, and (2) the person requesting such fingerprinting works or resides in the municipality where such department or division is located."

1224, 1228 (2d Cir. 1992) (standard for TRO is the same as preliminary injunction standard). A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Moore v. Consol. Edison Co., 409 F.3d 506, 510 (2d Cir. 2005) (citation omitted). "A decision to grant or deny a preliminary injunction is committed to the discretion of the district court." Polymer Tech. Corp. v. Mimran, 37 F.3d 74, 78 (2d Cir. 1994) (citation omitted).

"District courts may ordinarily grant preliminary injunctions when the party seeking the injunction demonstrates (1) that he or she will suffer irreparable harm absent injunctive relief, and (2) either (a) that he or she is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." Moore, 409 F.3d at 510 (internal quotation marks omitted). However, a higher standard applies here because plaintiffs seek an injunction that would "affect governmental action taken in the public interest pursuant to a statutory or regulatory scheme." Mullins v. City of New York, 626 F. 3d 47, 53 (2d Cir. 2010). They must therefore "demonstrate irreparable harm and a likelihood of success on the merits." Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir. 1996). Plaintiffs must also show that "the balance of hardships between the plaintiff and defendant" must "tip in the plaintiff's favor"; and "the public's interest" must in fact "weigh in favor of granting [the] injunction." Salinger v. Colting, 607 F.3d 68, 80 (2d Cir. 2010).

The burden plaintiffs must meet is further heightened by the nature of the relief they seek. They must demonstrate a "clear" or "substantial" likelihood of success on the merits — as opposed to just a likelihood of success on the merits — because they ask this Court to suspend existing orders and thus change the status quo, making the injunction they seek a "mandatory injunction" rather than just a

"prohibitory injunction." N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc., 883 F.3d 32, 37 (2d Cir. 2018) ("Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing a clear or substantial likelihood of success on the merits" (internal quotation marks omitted)); id. at 37 & n.5 (explaining that the status quo is "the last, actual, peaceable uncontested status which preceded the pending controversy") (internal quotation marks omitted)).

## V.    LEGAL ARGUMENT

### A.    Plaintiffs Lack Standing to Pursue Their Claims

To establish Article III standing, "a plaintiff must show (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Mhany Management, Inc. v. County of Nassau, 819 F.3d 581, 600 (2d Cir. 2016) (citation and quotation marks omitted).  "A federal court may have subject matter jurisdiction over a claim for damages yet lack jurisdiction over a claim for prospective equitable relief arising out of the same injury." Williams v. City of New York, 34 F. Supp. 3d 292, 295 (S.D.N.Y. 2014).

"In order to meet the constitutional minimum of standing to seek injunctive relief, [plaintiffs] must carry the burden of establishing that [they have] sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct." Shain v. Ellison, 356 F.3d 211, 215 (2d Cir. 2004) (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 101-02 (1983)) (emphasis added; internal quotation marks omitted).  The plaintiffs "cannot rely on past injury to satisfy the injury

14

requirement but must show a likelihood that [they] . . . will be injured in the future." Shain, 356 F.3d at

215 (citation and internal quotation marks omitted; emphasis added).

Here, the challenged actions alleged as to Chiefs Cota and Gould are specific to plaintiffs

Lowman and Brown.  Both claim injury with respect to the alleged refusal of the Ansonia and Bristol

Police Departments, based on Executive Order No. 7E, to take their respective fingerprints and accept

their related pistol permit applications for processing.  Compl., ¶¶ 33-37.  There is no dispute that the

temporary suspension of these procedures has been lifted in both the Ansonia and Bristol Police

Departments.  See Cota Decl., ¶ 19 (Ex. 2); Gould Decl. ¶ 13 (Ex. 1).  There is no dispute that plaintiff

Lowman has already scheduled to have his fingerprints take on May 22, 2020.  See Cota Decl., ¶ 20 (Ex.

2).  There is no dispute that plaintiff Brown has been scheduled for fingerprinting services at the BPD on

May 25, 2020.  See Gould Decl. ¶ 14 (Ex. 1).  Thus, any conceivable injury from the temporary

suspension of services complained of is now a "past injury" which cannot support standing for

injunctive relief (or will be as of May 25, at the latest).  Shain, 356 F.3d at 215.

Plaintiff Brown has further alleged that she should not even have to be fingerprinted for purposes

of a pistol permit application, because she was fingerprinted previously in connection with a pre-

employment background check.  Compl., ¶ 37.  This allegation does not give rise to standing for

injunctive relief.  First, Brown has not alleged, or averred in her declaration [doc. 4-6], that she was

previously fingerprinted at the Bristol Police Department.  Nor does she allege that she notified the

Bristol Police Department of these previously taken fingerprints when she contacted it on April 15,

2020, or at any other time prior to filing this suit.  Lastly, there is no dispute that the Bristol Police

Department has no record of fingerprinting Brown and her fingerprints are not on file with the

department.  See Gould Decl., ¶¶ 16-17.  Accordingly, this allegation, and the statutory provision to

which plaintiffs cite in regard to it,[12] do not change the standing analysis – any related injury is a past injury which does not afford Brown or Lowman standing for injunctive relief.

Plaintiffs' purported fear of future criminal penalties also does not suffice to give them standing for injunctive relief.  They allege that they would "purchase and possess firearms, ammunition, and magazines for lawful purposes … but for the reasonable fear and imminent risk of arrest and criminal prosecution under the State's laws imposing criminal sanctions on the transfer of firearms, ammunition, and/or magazines to persons who have not been issued a State-issued firearms certificate or permit." Compl., ¶ 63.  First, any penalties for the "purchase" or "transfer" of firearms, ammunitions or magazines bear no relation to permits plaintiffs seek from the Ansonia and Bristol Police Departments.

The only potentially applicable criminal sanction relates to the possession of a firearm in public, outside the home or place of business, without a pistol permit.  See Conn. Gen. Stat. §§ 29-28, 29-35. The notion that plaintiffs would be arrested on that basis amounts to sheer speculation which is not the type of concrete future harm eligible for injunctive relief.  Particularly given the fact that a law enforcement officers cannot stop a citizen and request to see a pistol permit unless he "has reasonable suspicion of a crime" and "observes" that individual carrying a pistol or revolver.  Conn. Gen. Stat. § 29-35(b).  Moreover, there is no guarantee that Lowman or Brown will obtain a permit to carry a firearm in public once their fingerprints are taken for purposes of their application.  At most, the threat of sanction under this lone potentially applicable statute entails "a highly attenuated chain of possibilities"

---

[12] General Statutes § 29-29(b) states: "The local authority shall take the fingerprints of such applicant or conduct any other method of positive identification required by the State Police Bureau of Identification or the Federal Bureau of Investigation, unless the local authority determines that the fingerprints of such applicant have been previously taken and the applicant's identity established, and such applicant presents identification that the local authority verifies as valid."  There is no dispute that Chief Gould made no such determination, and the statute does not require him to take additional steps beyond those already taken to relieve Ms. Brown of the obligation to be fingerprinted.

that could, in combination with a number of unpled facts, perpetrate the alleged constitutional harm.

Clapper v. Amnesty Int'l USA, 568 U.S. 398, 410 (2013).

The standing of the plaintiffs, and specifically plaintiffs Lowman and Brown, cannot be established by past delays in the fingerprinting procedures or inferred from the speculative theory that, if they carry a firearm, they could be subject to criminal arrest and prosecution.  See Clapper, 568 U.S. at 413-14 (declining to endorse a standing theory requiring a chain of speculation).  They lack standing to seek injunctive relief and their motion must be denied as to Chiefs Cota and Gould.

**B.      Plaintiffs' Motion and Their Claims Against Chiefs Cota and Gould are Moot**

Plaintiffs' challenge to Executive Order 7E, and the temporary suspension of fingerprinting for pistol permit applications in Ansonia and Bristol, is moot.  Under Article III of the Constitution, federal courts have authority to adjudicate only "Cases" and "Controversies;" therefore, courts may not "decid[e] legal disputes or expound[] on law in the absence of such a case or controversy."  Already, LLC v. Nike, Inc., 568 U.S. 85, 90 (2013).  "[A]n actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation. . . . A case becomes moot—and therefore no longer a Case or Controversy for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  Id. at 90–91 (internal quotation marks omitted).

Again, as to Chief Cota, there is no dispute that the ADP resumed fingerprinting for purposes of criminal background checks on May 20, 2020.  See Cota Decl.,  ¶ 19 (Ex. 2).  Nor is it disputed that plaintiff Lowman is scheduled to be fingerprinted on May 22, 2020.  Id., ¶ 20.  The BPD has also resumed fingerprinting for permit applications and plaintiff Brown is scheduled to be fingerprinted on

17

May 25.[13]  <u>See</u> Gould Decl., ¶ 13.  Given these facts, plaintiffs' request that Chiefs Lowman and Gould be enjoined from relying on Executive Order No. 7E to refuse to fingerprint plaintiffs Lowman and Brown is "no longer live."  <u>Already, LLC</u>, 568 U.S. at 91.  Plaintiffs' motion is thus moot as to Chiefs Cota and Gould and their respective police departments.

**C.**   **Plaintiffs Have Failed to Demonstrate Non-speculative Irreparable Harm**

"To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." <u>Grand River Enter. Six Nations, Ltd. v. Pryor</u>, 481 F.3d 60, 66–67 (2d Cir. 2007) (citation and internal quotation marks omitted).  Irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction," such that "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered."  <u>Id.</u> (citation and internal quotation marks omitted).

Plaintiffs contend that they are entitled to the presumption of irreparable injury because they have alleged "the deprivation of a constitutionally protected individual liberty."  Pl. TRO, at 12.  They have cited cases for the proposition that, as "a general matter, there is a presumption of irreparable harm when there is an alleged deprivation of constitutional rights."  <u>Id.</u> (quoting <u>Paykina v. Lewin</u>, 387 F.Supp.3d 222, 241 (N.D.N.Y 2019)).  However, the presumption in this regard is not a hard and fast rule in this Circuit.  <u>See</u> <u>Bronx Household of Faith v. Bd. of Educ. of City of New York</u>, 331 F.3d 342, 349 (2d Cir. 2003) ("Although '[t]he loss of First Amendment freedoms, for even minimal periods of

---

[13] General Statutes § 29-17c does not "prohibit a municipality from establishing a limited time period of hours during which such fingerprints may be collected."  Conn. Gen. Stat. § 29-17c(b).

time, unquestionably constitutes irreparable injury,' Elrod v. Burns, 427 U.S. 347, 373 (1976), we have

not consistently presumed irreparable harm in cases involving allegations of the abridgement of First

Amendment rights, see Amandola v. Town of Babylon, 251 F.3d 339, 343 (2d Cir. 2001) (per

curiam).").

     "Indeed, a bare assertion of a constitutional injury, without evidence convincingly show[ing] the

existence of noncompensable damages, is insufficient to automatically trigger a finding of irreparable

harm." Weinstein v. Krumpter, 120 F. Supp. 3d 289, 297 (E.D.N.Y. 2015)(citation and internal

quotation marks omitted).  In this regard, "[t]he court must not adopt a 'categorical' or 'general' rule or

presume that the plaintiff will suffer irreparable harm ... Instead, the court must actually consider the

injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on

the merits, paying particular attention to whether the 'remedies available at law, such as monetary

damages, are adequate to compensate for that injury." Salinger v. Colting, 607 F.3d 68, 80 (2d Cir.

2010) (citation and quotation marks omitted).

     Weinstein, which also involved a motion for preliminary injunctive relief related to firearms, is

instructive in that it addressed the irreparable injury element as follows:

> A preliminary injunction is inappropriate here because the Plaintiff fails to
> identify any actual and imminent harm that he will suffer if an injunction
> does not issue. Indeed, because Weinstein's pistol license and firearms
> have been returned to him, and he does not allege any reasonably
> foreseeable possibility of having them re-confiscated during the pendency
> of this action, there is no evidence suggesting that he is likely to suffer any
> injury if he does not succeed on the instant motion, but ultimately prevails
> on the merits of his claims. This is especially true because the Second
> Amended Complaint contains a claim for monetary damages, including
> punitive damages, for the past deprivation of his rights. In the Court's
> view, there is no risk of an imminent noncompensable injury in the
> absence of a preliminary injunction.

Id., 120 F. Supp. 3d at 297.

Here, similarly, the injunctive relief sought by plaintiffs, at least with respect to Chiefs Cota and Gould, is inappropriate.  Plaintiffs Lowman and Brown are free to utilize the fingerprint procedures which had been suspended, and in fact are both scheduled to do so in the coming days.  This development warrants the denial of their motion.  Albeit in a different context, this Court has previously denied a motion for a preliminary injunction because the conditions the plaintiffs sought to enjoin had already been lifted by the defendant.  See Malave v. Weir, No. 3:16-cv-00009 (JAM) 2016 WL 4046699, at *4 (D. Conn. 2016) (Here, I conclude—in light of the changed factual circumstances of this case—that plaintiffs cannot show ongoing irreparable harm. It is undisputed that they are no longer subject to a categorical ban on telephonic or in-person visitation. As of July 19, they are subject only to a restriction on contact visits. They are otherwise free to talk by telephone and to visit in person, and—absent additional disciplinary restrictions—they will be free to resume contact visits less than two months from now.").

Lastly, to the extent plaintiffs can establish any constitutional injury as the result of the brief suspension of fingerprinting services (which, at most, impacted Lowman for 37 days and Brown for 35 days), their amended complaint seeks monetary and punitive damages for any such "past deprivation." Compl., Prayers for Relief, ¶¶ 2-3.  It is well settled that, "[w]here monetary damages may provide adequate compensation, a preliminary injunction should not issue."  Jayaraj v. Scappini, 66 F.3d 36, 39 (2d Cir. 1995) (reversing the district court's granting of a preliminary injunction based on a violation of the due process clause because the plaintiff failed to meet its burden of establishing irreparable harm).

Any purported violation of plaintiff Lowman or Brown's rights[14] is not ongoing, and they cannot satisfy the irreparable harm standard which is fatal to their motion. Id.

### D.       Plaintiffs Are Not Likely To Succeed On The Merits of Their Claims

Even if plaintiffs had standing and their motion was not moot with respect to Chiefs Cota and Gould, and the temporary suspension of fingerprinting by the Ansonia and Bristol Police Departments, it must be denied because they cannot demonstrate a "clear" or "substantial" likelihood that they will succeed on the merits of any of their claims.

### 1.       The Suspension of Fingerprinting Is a Valid Exercise Of The Statutory Duty And Authority To Take Action To Mitigate A Public Health Emergency

In its seminal decision establishing the standard which governs the federal constitutionality of state emergency measures taken in the context of a public health crisis, Jacobson v. Commonwealth of Mass., 197 U.S. 11 (1905), the Supreme Court  recognized that "[t]he safety and the health of the people of" a state "are, in the first instance, for that [state] to guard and protect." Id., at 38.  "They are matters that do not ordinarily concern the national government." Id.  Rather, "they depend, primarily, upon such action as the state, in its wisdom, may take." Id.  In effectuating his duty to safeguard and protect the citizens of this state in the face of a deadly pandemic, Governor Lamont issued Executive Order 7E pursuant to General Statutes § 28-9(b)(1), which authorizes him to "modify or suspend in whole or in part, by order as hereinafter provided, any statute, regulation or requirement or part thereof whenever the Governor finds such statute, regulation or requirement, or part thereof, is in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health."  The Order, and its provision temporarily suspending municipal fingerprinting obligations, fell within the

---

[14] These defendants maintain, of course, that no such violation occurred.

latitude afforded states in public health emergencies, and pass constitutional muster under <u>Jacobson</u> and its progeny.

In <u>Jacobson</u>, the Supreme Court considered a claim that the state's compulsory vaccination law - enacted amidst a growing smallpox epidemic in Cambridge, Massachusetts - violated the plaintiff's Fourteenth Amendment right "to care for his own body and health in such way as to him seems best." <u>Id.</u>, at 26.  In rejecting that claim the Supreme Court observed that "liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." <u>Id.</u>  Rather, "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." <u>Id.</u>, at 27.  In this regard, the Court noted that, "in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." <u>Id.</u>, at 29.

<u>Jacobson</u> further mandates judicial deference to emergency measures taken in such situations:

> If there is any such power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is  the duty of the courts to so adjudge, and thereby give effect to the Constitution.

<u>Id.</u>, at 31.

Thus, constitutional rights, including Second Amendment rights, are subject to "reasonable conditions" to preserve public health.  <u>Id.</u> at 26–27 ("Even liberty itself, the greatest of all rights, is not

unrestricted license to act according to one's own will."); <u>Prince v. Massachusetts</u>, 321 U.S. 158, 166–

67 (1944) ("The right to practice religion freely does not include liberty to expose the community or the

child to communicable disease or the latter to ill health or death."); <u>Phillips v. City of New York</u>, 775

F.3d 538, 542 (2d Cir. 2015) (finding that plaintiffs' argument that New York's mandatory vaccination

requirement violated substantive due process "is foreclosed by the Supreme Court's decision in

Jacobson," rejecting First Amendment Free Exercise challenge based on Prince and other precedent, and

upholding the mandatory vaccination requirement).

        Just two days ago, in <u>Amato, et al. v. Elicker, et al.</u>, No. 3:20-CV-00464-MPS, Judge Shea

determined, in the same procedural context, that "the standard articulated in <u>Jacobson</u> applies" to the

recent Executive and Emergency Orders issued in response to the pandemic.  <u>See</u> Ex. 3, Ruling on

Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction ("Ruling").  Plaintiffs

in <u>Amato</u> have challenged Governor Lamont's Executive Order No. 7N, and specifically a provision in

it that prohibits gatherings of six (6) or more people for social purposes.  In denying those plaintiffs'

motion for a temporary restraining order and preliminary injunction staying enforcement of that

provision, Judge Shea explained:

> Executive Order 7N has a "real and substantial relation" to the state's goal
> of curbing the spread of the virus. The Order states that the restriction on
> the size of gatherings is imposed in light of recommendations from the
> CDC and the Connecticut Department of Public Health to implement
> "community mitigation strategies to increase containment of the virus and
> to slow transmission of the virus" and an increase in "COVID-19
> infections and resulting hospitalizations . . in recent days, at the same time
> that residents of areas with high infection rates have arrived in
> Connecticut, creating a need to enact further mandatory distancing
> measures to limit the rate of spread of the disease." Executive Order No.
> 7N at 3 (Mar. 26, 2020).

Ex. 3, Ruling, pp. 22-23.

In precisely the same way, the provision in Executive Order No. 7E challenged by plaintiffs here has a "real and substantial relation" to the goal of "limit[ing] the transmission of COVID-19."  Ex. Order 7E, ¶ 2.  It serves that goal by eliminating a procedure that, by its very nature, requires not only close physical proximity, but physical contact between a member of the public and a member of the department.  See Gould Decl., ¶ 7.  When an emergency measure like the temporary suspension of this procedure is imposed for the benefit of public health and safety,[15] "[i]t is no part of the function of a court" to decide whether they are "likely to be the most effective for the protection of the public against disease."  Jacobson, 197 U.S. at 30.

Moreover, the temporary suspension of fingerprinting at issue here was not "arbitrary" or "unreasonable" or "beyond all question, a plain, palpable invasion of rights."  Id., at 31.  At most, it briefly impacted the ability of plaintiff Lowman and Brown to obtain a permit to carry a handgun on their person, outside of their homes or places of business.  Conn. Gen. Stat. 29-35.  It did not foreclose their ability to purchase a handgun or ammunition or to possess a handgun within their home or places of business.  This is particularly relevant given that, at all times relevant, Connecticut residents like the plaintiffs had been advised to stay at home to every extent possible.

There is absolutely no basis to argue that the challenged provision of Executive Order 7E is not "reasonably and substantially" related to the current public health crisis – by its own terms, it is aimed directly at the societal goal to "limit the transmission of COVID-19."  This direct connection between the provision authorizing departments to temporarily cease subjecting their officers or employees to physical contact with members of the public, to advance the critical goal of thwarting the rapid

---

[15] Exposing one member, and thus all members, of municipal police departments to COVID-19 risks not only their health but the safety of the citizens they protect and serve.

transmission of this highly contagious – and in many cases deadly – virus, more than satisfies the

"reasonable and substantial" test that has endured in the law since Jacobson.  Plaintiffs cannot succeed

on any of their claims under this applicable standard and there motion should be denied accordingly.

> **2.    The Temporary Suspension of Fingerprinting For Purposes of Criminal Background Checks Did Not Violate Plaintiffs' Second Amendment Rights**

Even if this Court does not agree with Judge Shea's determination that the Jacobson standard

applies to plaintiffs' claims, they still cannot show the required "substantial" likelihood of success on

their Second Amendment claim.  The Second Amendment to the U.S. Constitution,[16] applicable to the

states through the Fourteenth Amendment, McDonald v. City of Chicago, 561 U.S. 742 (2010), provides

an individual right to keep and bear arms.  District of Columbia v. Heller, 554 U.S. 570, 595 (2008).

However, "the right secured by the Second Amendment is not unlimited," and is "not a right to keep and

carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  Id. at 626.

The Supreme Court in Heller clarified that its decision should not call into question

"longstanding prohibitions on the possession of firearms" by certain classes of persons, such as the

mentally ill and convicted felons, and in certain places constituting security concerns.  Id., at 626–27 &

n. 26.  Thus, the Supreme Court suggested that the core purpose of the right conferred by the Second

Amendment was to permit "law-abiding, responsible citizens to use arms in defense of hearth and

home."  Id. at 635 (emphasis supplied); see also id. at 635 ("[W]e hold that the District's ban on handgun

possession in the home violates the Second Amendment, as does its prohibition against rendering any

lawful firearm in the home operable for the purpose of immediate self-defense.").  Thus, the challenged

---

[16] The Second Amendment provides that, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

provision, which does not foreclose plaintiffs from purchasing or possessing a firearm in their home or place of business, does not impact the "core" Second Amendment right established in Heller.

"Aside from these broad guidelines, Heller offered little guidance for resolving future Second Amendment challenges." New York State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 253 (2d Cir. 2015). Heller "did imply that such challenges are subject to one of 'the standards of scrutiny that we have applied to enumerated constitutional rights,' though it declined to say which, accepting that many applications of the Second Amendment would remain 'in doubt.'" Cuomo, 804 F.3d at 253. The Second Circuit "has begun to develop a framework for determining the constitutionality of firearm restrictions." Id. at 254 (citing Kachalsky v. Cty. of Westchester, 701 F.3d 81 (2d Cir. 2012); United States v. Decastro, 682 F.3d 160 (2d Cir. 2012)). This two-step inquiry was described in Cuomo:

> First, we consider whether the restriction burdens conduct protected by the Second Amendment. If the challenged restriction does not implicate conduct within the scope of the Second Amendment, our analysis ends and the legislation stands. Otherwise, we move to the second step of our inquiry, in which we must determine and apply the appropriate level of scrutiny.

804 F.3d at 253 (citing Kachalsky, 701 F.3d at 93).

The first inquiry is akin to the principle that, "if a law neither burdens a fundamental right nor targets a suspect class," the legislative classification will be upheld "so long as it bears a rational relation to some legitimate end." Romer v. Evans, 517 U.S. 620, 631 (1996). Arguably, rational basis review is the appropriate standard to apply to the challenged provision of Executive Order No. 7E, because it "involves no suspect classification and imposes no burden on the Second Amendment right to keep and bear arms." Kwong v. Bloomberg, 876 F. Supp. 2d 246, 260–61 (S.D.N.Y. 2012), aff'd, 723 F.3d 160 (2d Cir. 2013). The temporary suspension of fingerprinting for criminal background checks applied

universally to individuals who wanted to utilize that procedure.  Also, it did not burden a core Second

Amendment right to possess handguns in one's home  -  it simply delayed applications for permits to

carry handguns in public.  Moreover, there can be no argument that the provision bears a rational

relation to the legitimate end of slowing the transmission of COVID-19.  The provision easily satisfies

rational basis review.

Should this Court find that Executive Order No. 7E burdens plaintiffs' Second Amendment

rights as articulated in <u>Heller</u>, it must then determine "which level of judicial 'scrutiny' applies."  <u>Id.</u>, at

258.  "In determining whether heightened scrutiny applies, we consider two factors: (1) how close the

law comes to the core of the Second Amendment right" and (2) "the severity of the law's burden on the

right."  <u>Id.</u> (citation and internal quotation marks omitted).  "Laws that neither implicate the core

protections of the Second Amendment nor substantially burden their exercise do not receive heightened

scrutiny."  <u>Id.</u>

"[H]eightened scrutiny need not apply to any marginal, incremental or even appreciable restraint

on the right to keep and bear arms."  <u>Id.</u> at 258-59 (citation and quotation marks omitted).  Rather,

"heightened scrutiny is triggered *only* by those restrictions that (like the complete prohibition on

handguns struck down in <u>Heller</u> ) operate as a substantial burden on the ability of law-abiding citizens to

possess and use a firearm for ... lawful purposes."  <u>Id.</u> at 259 (citation omitted; emphasis in original); <u>see</u>

<u>also</u> <u>Decastro</u>, 682 F.3d at 165–69 (explaining that courts should apply heightened scrutiny in the

Second Amendment context only to laws that impose a substantial burden).

The Second Circuit has held that intermediate scrutiny is appropriate for gun laws that do not

"burden the 'core' protection of self-defense in the home."  <u>Kachalsky</u>, 701 F.3d at 93.  Thus, for

example, in <u>Kachalsky</u>, the Second Circuit applied intermediate scrutiny to a New York state law that

restricted an individual's ability to carry handguns "in public," as opposed to "in the home." Id., at 94–96.  The Second Circuit has also instructed that "[n]o 'substantial burden' exists – and hence heightened scrutiny is not triggered – 'if adequate alternatives remain for law abiding citizens to acquire a firearm for self-defense.'" Cuomo, 804 F.3d at 259  (quoting U.S. v. Decastro , 682 F.3d 160, 168 (2d Cir. 2012).

Here, the temporary and now lifted suspension of fingerprinting for purposes of a permit to carry a firearm outside one's home or place of business, simply did not present a substantial burden on the "core protection of self-defense inside hearth and home for law-abiding, responsible citizens." Aron v. Becker, 48 F. Supp. 3d 347, 371 (N.D.N.Y. 2014).  In fact, the suspension of fingerprinting at these departments posed no burden at all on the right of Plaintiff Lowman, Plaintiff Brown, or any other similarly situated residents of Ansonia or Bristol, "to use arms in defense of hearth and home." Heller, 554 U.S. at 635.  No temporary (i.e. municipal) or state pistol permit is required to exercise that core Second Amendment right.  See Conn. Gen. Stat. §§ 29-36f, 29-36g.

Thus, to the extent any scrutiny is applied here, applicable precedent dictates that it be intermediate scrutiny.  See Aron, 48 F. Supp. at 371 ("[T]he Court will apply intermediate scrutiny to determine whether the challenged provisions of New York's pistol permit regulations are substantially related to the governmental interests sought to be advanced by those regulations, and whether there is a reasonable fit between the objective and the law.); see also Kachalsky, 701 F.3d at 96–97 ("Because our tradition so clearly indicates a substantial role for state regulation of the carrying of firearms in public, we conclude that intermediate scrutiny is appropriate in this case. The proper cause requirement passes constitutional muster if it is substantially related to the achievement of an important governmental

interest.")(citing Ernst J. v. Stone, 452 F.3d 186, 200 n. 10 (2d Cir. 2006) ("[T]he label 'intermediate

scrutiny' carries different connotations depending on the area of law in which it is used.").

      As to the application of that standard, the Second Circuit has stated:

> To survive intermediate scrutiny, the fit between the challenged regulation
> [and the government interest] need only be substantial, not perfect. Unlike
> strict scrutiny analysis, we need not ensure that the statute is narrowly
> tailored or the least restrictive available means to serve the stated
> governmental interest. Moreover, we have observed that state regulation
> of the right to bear arms has always been more robust than analogous
> regulation of other constitutional rights. So long as the defendants produce
> evidence that fairly supports their rationale, the laws will pass
> constitutional muster.

Cuomo, 804 F.3d at 261 (citations omitted).

      When applying "intermediate scrutiny" the "key question is whether the statutes at issue are

substantially related to the achievement of an important governmental interest." Cuomo, 804 F.3d at

261 (quoting Kachalsky, 701 F.3d at 96).  Here, as previously discussed, and as stated expressly in

Executive Order No. 7E, the temporary suspension of fingerprinting obligations imposed on municipal

police departments was enacted to "limit the transmission of COVID-19 or focus resources on critical

public safety needs" during the current pandemic. This provision is directly related to achieve these dual

public interests and thus easily survives intermediate scrutiny as a matter of law.  To survive

intermediate scrutiny, the "fit between the challenged regulation [and the government interest] need only

be substantial, not perfect." Kachalsky, 701 F.3d at 97 (internal quotation marks omitted).  A substantial

fit must be found here.

      Lastly, even if the Court were to apply strict scrutiny – a proposition which finds no support in

decisions from this Circuit – the challenged provision would pass muster.  To pass strict scrutiny, a law

must be narrowly tailored to serve a compelling governmental interest.  Abrams v. Johnson, 521 U.S.

74, 91 (1997).  The challenged provision of Executive Order No. 7E, and its temporary application by the Ansonia and Bristol Police Departments, satisfy this standard.  The provision was specifically tailored to advance the compelling governmental interest of protecting police officers and departments from the potential exposure to COVID-19 inherent in the fingerprinting process.  Given the concerns about the transmission of this virus, the temporary suspension of a statutory requirement which compels members of municipal police departments to come into physical contact with permit applicants could not be more tailored.  The provision does not pertain to or effect the processing of applications for applicants who have already been fingerprinted.  It does not otherwise restrict permitting procedures.  It simply protects police officers from physical contact during a period that social distancing is of the utmost importance.  It thus survives even strict scrutiny – which should not be applied in any event.

> **3.**     **The Temporary Suspension of Fingerprint Processing Did Not Violate Plaintiffs' Due Process Rights**

In Count 2, plaintiffs allege that Executive Order 7E, and the resulting suspension of fingerprinting, left them with "no lawful process through which to obtain a State-issued certificate or permit to exercise their constitutional right "to keep and bear arms."  Compl., Count 2, ¶ 80.  They further allege that the "conduct of eliminating all lawful process for the Plaintiffs to obtain a State-issued certificate or permit, while continuing to require the Plaintiffs first obtain a State-issued certificate or permit to exercise their constitutional right, is a violation of the Plaintiffs' Fifth & Fourteenth Amendment right to due process of law."  Id., ¶ 88.  Plaintiffs do not specify whether they are claiming a deprivation of procedural or substantive due process rights.  They are unlikely to succeed on the merits of either theory.

###### i.  Procedural Due Process

"A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." Bryant v. N.Y. State Educ. Dep't, 692 F.3d 202, 218 (2d Cir. 2012) (citation omitted). To establish deprivation of a property interest, a plaintiff must demonstrate an interest "in a benefit that is 'more than an abstract need or desire for it ... [He] must, instead, have a legitimate claim of entitlement to it' under state or federal law in order to state a § 1983 claim." Finley v. Giacobbe, 79 F.3d 1285, 1296 (2d Cir. 1996) (quoting Board of Regents v. Roth, 408 U.S. 564, 577 (1972)).

"[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion." Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005) (citing Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 462–63 (1989)).  Under Connecticut law, municipal police chiefs may deny an application for a temporary pistol permit if he or she determines that the applicant is not a "suitable person to receive such permit…"  Conn. Gen. Stat. § 29-28(b).  Since the decision whether to issue a temporary pistol permit is discretionary, plaintiffs cannot establish that they have a protected property interest in the permit.  See Perros v. Cty. of Nassau, 238 F. Supp. 3d 395, 400–01 (E.D.N.Y. 2017)("Since it is a discretionary decision on [defendant's] part whether to issue a pistol permit, and by extension, a good guy letter, Plaintiffs cannot establish that they have a protected property interest in either the pistol permit or the good guy letter they seek to obtain. Accordingly, their First Amended Complaint fails to state a claim for a procedural due process violation and that claim is hereby dismissed.").

Moreover, even if plaintiffs could establish a protected property interest in a temporary pistol permit, they are unable to establish that they were deprived of it without sufficient process.  "Broadly

31

speaking, a delay amounts to a due process violation only where it renders the prescribed procedures meaningless in relation to the private interest at stake." Kuck v. Danaher, 600 F.3d 159, 163 (2d Cir. 2010). "[T]he mere assertion that state remedies are lengthy ... will not render state remedies inadequate [under the Due Process Clause] unless they are inadequate to the point that [they are] meaningless or nonexistent." Gyadu v. Workers' Comp. Comm'n, 129 F.3d 113 (2d Cir. 1997)(citation and internal quotation marks omitted); see also Connecticut v. Doehr, 501 U.S. 1, 10 (1991) ("[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.")(internal quotation marks omitted).

Here, the delay in access to the fingerprinting procedure in the temporary pistol permitting process was not indefinite – plaintiffs Lowman and Brown were delayed 37 and 35 days, respectively. This delay can hardly be described as "lengthy" given that the entire statutory process leading up to acquisition of a temporary pistol permit, which plaintiffs do not claim to be facially unconstitutional, can take up to eight weeks. See Conn. Gen. Stat. § 29-28a (b)("The local authority shall, not later than eight weeks after a sufficient application for a temporary state permit has been made, inform the applicant that such applicant's request for a temporary state permit has been approved or denied."). More importantly, in the context of this pandemic, the delay was not only reasonable but served the crucial function of protecting department members from exposure to COVID-19 and diverting limited resources to public safety.

Furthermore, Plaintiffs Lowman and Brown cannot succeed on procedural due process grounds because they have failed to allege that they in fact utilized the process afforded them. More specifically, even accepting their allegations that the Ansonia and Bristol Police Departments refused to accept their

temporary pistol permit applications, Lowman and Brown had administrative recourse under General

Statutes § 29-32b (b).  Pursuant to the statute:

> Any person aggrieved…by a refusal or failure of any issuing authority to
> furnish an application as provided in section 29-28a, may, within ninety
> days after receipt of notice of such refusal, limitation or revocation, or
> refusal or failure to supply an application as provided in section 29-28a,
> and without prejudice to any other course of action open to such person in
> law or in equity, appeal to the board. On such appeal the board shall
> inquire into and determine the facts, de novo, and unless it finds that such
> a refusal, limitation or revocation, or such refusal or failure to supply an
> application, as the case may be, would be for just and proper cause, it shall
> order such permit or certificate to be issued, renewed or restored, or the
> limitation removed or modified, as the case may be. If the refusal was for
> failure to document compliance with local zoning requirements, under
> subsection (a) of section 29-28, the board shall not issue a permit.

Conn. Gen. Stat. § 29-32b(b).

Having failed to utilize the process afforded them in response to the purported refusals to accept

their pistol permit applications, plaintiffs cannot proceed on a procedural due process claim here.  See

Aron v. Becker, 48 F. Supp. 3d 347, 375–76 (N.D.N.Y. 2014)(Plaintiffs "cannot reject the opportunity

to meaningful due process review and then come to this court seeking damages for what [they] assert[]

is a due process violation. Any procedural due process claim asserted in the Complaint is dismissed.").

Plaintiffs cannot show a clear or substantial likelihood of success on a procedural due process claim.

### ii.    **Substantive Due Process**

Plaintiffs also cannot prevail on a substantive due process claim premised on the brief

interruption of fingerprinting for purposes of pistol permit application.  First, it is well settled that,

"[w]here a particular Amendment provides an explicit textual source of constitutional protection against

a particular sort of government behavior, that Amendment, not the more generalized notion of

'substantive due process,' must be the guide for analyzing these claims." Albright v. Oliver, 510 U.S.

266, 273 (1994)(citing Graham v. Connor, 490 U.S., 386, 395 (1989)).  In other words, plaintiffs cannot claim any broader protection of the right to bear arms via the Fourteenth Amendment than that afforded by the Second Amendment.  It is only if the claim alleged is not covered by a particular Amendment that the Court should address whether there is nonetheless a claim for substantive due process.  County of Sacramento v. Lewis, 523 U.S. 833, 843 (1998)(citing U.S. v. Lanier, 520 U.S. 259, 272 n. 7 (1997)).

Moreover, the challenged conduct here – a brief interruption in fingerprinting individuals in connection with pistol permit applications, in the throes of a pandemic involving an easily transmitted virus – does not even approach the level of misconduct necessary to state a viable substantive due process claim.  "Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority[.]"  Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999)  (citation omitted).  While Plaintiffs may disagree with Governor Lamont's Executive Order No. 7E and the compliance with it by Chiefs Cota and Gould, the brief delay in access to fingerprinting for purposes of pistol permit applications certainly does not give rise to a viable substantive due process claim.  See Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994) (Substantive due process prohibits the government from taking actions that are "arbitrary," "conscience-shocking," or "oppressive" in a constitutional sense. "[I]ncorrect or ill-advised" government action is insufficient to give rise to a substantive due process violation.) (citations omitted); see also SeaAir N.Y., Inc. v. City of N.Y., 250 F.3d 183, 187 (2d Cir. 2001) (To state a cognizable claim for a violation of substantive due process, a plaintiff must show that the government exercised power " 'without any reasonable justification in the service of a legitimate governmental objective[.]' ") (quoting County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)).  Plaintiffs have not stated a viable substantive due process claim and cannot demonstrate a clear or substantial likelihood to succeed on such a claim.

### 4.    Plaintiffs  Cannot Succeed on their Equal Protection Claim

Plaintiffs are also not likely to succeed on their Equal Protection claim in Count 3.[17]  "There are two types of equal protection claim available under 42 U.S.C. § 1983: selective enforcement and class of one."  Musco Propane, LLP v. Town of Wolcott, 891 F. Supp. 2d 261, 271–74 (D. Conn. 2012), aff'd sub nom. Musco Propane, LLP v. Town of Wolcott Planning & Zoning Comm'n, 536 F. App'x 35 (2d Cir. 2013).

To prevail on a claim of selective enforcement, the Second Circuit requires that a plaintiff show both (1) that he or she was treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.  Harlen Ass. v. Inc. Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) (internal citations and quotation marks omitted). The equal protection clause in the Fourteenth Amendment is "essentially a direction that all person similarly situation should be treated alike."  City of Cleburne, Tex. V. Cleburne Living Ctr. Inc., 473 U.S. 432, 439 (1985).

The "similarly situated" element is "the *sine qua non*" of an equal protection claim based on selective enforcement; Goldfarb v. Town of West Hartford, 474 F. Supp. 2d 356, 368 (D. Conn. 2007); and in this Circuit, an alleged comparator is not "similarly situated" unless plaintiff pleads and proves it to be "*prima facie* identical" in all material respects.  Neilson v. D'Angelis, 409 F. 3d 100, 105 (2d Cir. 2005) (internal quotation marks and citation omitted).

---

[17] Plaintiffs did not address their equal protection claim or privileges and immunities claim in their legal memorandum in support of their instant motion.

Here, there is no allegation that any individuals who are similarly situated to Plaintiffs Lowman or Brown were treated more favorably by the Ansonia or Bristol Police Departments.  Quite the opposite.  Plaintiffs do not allege that other residents of these municipalities, who also desired to be fingerprinted for purposes of temporary pistol permit applications, were afforded that procedure during the relevant time period.  Indeed, plaintiffs allege that "similarly situated" individuals were treated the same way they were throughout the complaint.  See, e.g., Compl., ¶¶ 63, 64, 65, 772, 73, 74.

Plaintiffs Lowman and Brown are similarly unable to prevail under a "class of one" theory.  "A class-of-one claim exists where the plaintiff alleges that [it] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Analytical Diagnostic Labs, Inc. v. Kusel, 626 F.3d 135, 140 (2d Cir. 2010) (internal quotation marks and citation omitted).  "Class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves."  Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 59–60 (2d Cir.2010) (alteration, citation, and internal quotation marks omitted).  Again, plaintiffs do not allege that they have been treated differently than other comparators with whom they have an extremely high degree of similarity.  They allege that all individuals similarly situated to them were prevented from obtaining fingerprinting for purposes of a temporary pistol permit application.  Plaintiffs have no likelihood of success on their equal protection claims.

### 5.	Plaintiffs  Cannot Succeed on their Privileges and Immunities Clause Claim

Plaintiffs have no likelihood of success on the Privileges and Immunities claim in Count 4 of their complaint.  The Privileges and Immunities Clause of Article IV provides that "[t]he citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2.  The Privileges and Immunities Clause of Article IV is "intended to foster a national

economic union" and thus "limits a State's power to discriminate against residents of other States with respect to the privileges and immunities that are 'sufficiently basic to the livelihood of the Nation' and that "bear[ ] upon the vitality of the Nation as a single entity." Connecticut ex rel. Blumenthal v. Crotty, 346 F.3d 84, 94 (2d Cir. 2003)(quoting Baldwin v. Fish & Game Comm'n of Mont., 436 U.S. 371, 383 (1978)).

"As a general rule, Privileges and Immunities Clause analysis requires [courts] to consider (1) whether a State has, in fact, discriminated against out-of-staters with regard to the privileges and immunities it accords its own citizens, and (2) if so, whether there is sufficient justification for the discrimination." Id. (citation omitted).  Plaintiffs' claim here does not survive the first inquiry, as they are Connecticut residents.  Nor does the challenged provision of Executive Order No. 7E discriminate based on state citizenship.  Quite simply, the Privileges and Immunities Clause is not invoked by and does not apply to the allegations and issues raised by plaintiffs in this case.

> ### E.     The Damage of The Proposed Injunction Far Outweighs Any Injury to Plaintiff and Is Adverse to Public Interest

Even if the plaintiffs could demonstrate a likelihood of success on the merits of their claims challenging the temporary suspension of fingerprinting for purposes of pistol permit applications – which they cannot – the injunctive relief they seek has already been granted.  Chiefs Gould and Cota exercised the discretion afforded them by Governor Lamont and resumed fingerprinting procedures in a manner which addresses the safety concerns underlying the suspension in the first place.  Simply put, neither plaintiffs Lowman and Brown,  nor any other residents of Ansonia or Bristol, are suffering damages from a temporary suspension which has now been lifted.

Moreover, this pandemic is a fluid situation and circumstances may warrant or require Chiefs Cota and Gould, and any or all other municipal police chiefs, to exercise the discretion afforded them by Executive Order 7E.  If the resumption of fingerprinting procedures, or any other factor, results in members of police departments contracting the virus, the public interest in not only health but safety may favor another cessation of fingerprinting procedures.  This is a trial and error period for all aspects of society, and flexibility is necessary to safeguard public health and save lives.  For this reason, and in light of the fact that plaintiffs Lowman and Brown are no longer suffering any impediment to their permit application process, plaintiffs' motion should be denied as to these defendants and their respective police departments.

### F.   No Evidentiary Hearing Is Necessary Or Warranted

Given that there is no dispute that the suspension of fingerprinting procedures are no longer in place, and in light of the fatal deficiencies of plaintiffs' underlying constitutional claims, this Court need not and should not grant them a hearing to pursue injunctive relief which they have already been afforded.  In this Circuit "there is no hard and fast rule . . . that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it."  Maryland Cas. Co. v. Realty Advisory Bd. of Labor Relations, 107 F.3d 979, 984 (2d Cir. 1997) (quoting Consolidated Gold Fields PLC v. Minorco, S.A., 871 F.2d 252, 259 (2d Cir. 1989)).  "Generally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when essential facts are not in dispute."  Id.  "[W]hen the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case...or when the disputed facts are amenable to complete resolution on a paper record," a hearing is not required to resolve a motion for

preliminary injunction.  <u>Charette v. Town of Oyster Bay</u>, 159 F.3d 749, 755 (2d Cir. 1998) (citations

omitted).

In <u>Hayes v. Arnone</u>, No. 3:12-CV-16972013(MPS), WL 6017334, at *1 (D. Conn. 2013), Judge

Shea held that, although a hearing and evidence are generally required on a properly supported motion

for a preliminary injunction, in appropriate circumstances, oral testimony and argument are not

necessary.  More recently, in <u>Amato</u>, Judge Shea declined to schedule or conduct a hearing because the

parties' filings established that no hearing is necessary to resolve the motion for temporary restraining

order/preliminary injunction filed by plaintiffs in that action.  <u>See</u> Civil Docket Sheet, Doc. No. 32.

Judge Shea declined to hold an evidentiary hearing on the <u>Amato</u> plaintiffs' motion for a temporary

restraining order/preliminary injunction.  <u>See</u> Ex. 3, Ruling, pp. 7-8 ("Neither party in this case points to

any essential facts in dispute, and I deny the Plaintiffs' motion, taking as true the allegations in their

complaint and the sworn statements in their affidavits.").

Similarly, here, no fact material to plaintiffs' challenges to the issuance and application of

Executive Order No. 7E in Ansonia or Bristol is disputed.  The challenge is moot.  And these defendants

and their police departments should not be burdened with a hearing that is not necessary to resolve

plaintiffs' motion.  These defendants respectfully request that plaintiffs' motion and defendants'

objections to it be decided on the papers.

## VI.    <u>CONCLUSION</u>

Police Chiefs Brian Gould and Andrew Cota cannot be faulted for implementing reasonable

safety measures, including the temporary suspension of collecting fingerprints, to protect the health of

their employees and the public that they serve.  This minor interruption in services offered to the public

is hardly different from the interruptions that citizens experienced with virtually all other aspects of government, or business, with almost every sector of our economy being impacted by COVID-19, and the safe-distancing measures that were applied to try to stop the spread of the virus.

While civil liberties and Second Amendment rights must be vigorously defended, especially in this time of crisis, there is absolutely no factual or legal basis from which this Court can find a Constitutional violation.  For the foregoing reasons, Police Chiefs Brian Gould  and Andrew Cota respectfully request that this Court deny plaintiffs' motion for a temporary restraining order and preliminary injunction on the papers, and cancel the evidentiary hearing scheduled for June 1, 2020.

DEFENDANTS,
POLICE CHIEF BRIAN GOULD
POLICE CHIEF ANDREW COTA

BY/ss/ James N. Tallberg
James N. Tallberg
Federal Bar No.: ct17849
Patrick D. Allen
Federal Bar No.: ct28403
Karsten & Tallberg, LLC
500 Enterprise Dr., Suite 4B
Rocky Hill, CT 06067
T: (860)233-5600
F: (860)233-5800
jtallberg@kt-lawfirm.com
pallen@kt-lawfirm.com

**<u>CERTIFICATION</u>**

I hereby certify that on May 21, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

<u>/ss/ James N. Tallberg</u>
James N. Tallberg