# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CONNECTICUT CITIZENS DEFENSE
LEAGUE, INC. *et al*.,
  *Plaintiffs*,

  v.

GOVERNOR NED LAMONT *et al*.,
  *Defendants*.

No. 3:20-cv-00646 (JAM)

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

In Connecticut, you cannot acquire, possess, or carry a handgun without a state permit or

certificate. To get a permit or certificate, you must go to the local police or the Connecticut

Department of Emergency Services and Public Protection ("DESPP") to have an officer there

collect your fingerprints for purposes of a criminal background check.

Under Connecticut law, employees for the local police and DESPP may not refuse to

collect the fingerprints of a person who seeks to apply for a handgun permit or certificate. In

light of the exigencies of the COVID-19 pandemic, however, the Governor of Connecticut issued

an executive order nearly three months ago that indefinitely suspends this law for so long as the

COVID-19 emergency may continue. The executive order leaves it to the discretion of state and

local police whether to conduct fingerprinting, thus empowering the police to functionally deny

the right of new applicants to acquire, carry, and possess a handgun. Consistent with the

Governor's order, DESPP and some unknown number of police departments have suspended all

fingerprint collection activities that the law used to require them to do.

The Connecticut Citizens Defense League and several of its members have sued the

Governor and the Commissioner of DESPP, claiming that the indefinite suspension of

fingerprinting violates their rights under the Second Amendment and other federal constitutional provisions. They have moved for a preliminary injunction to require the resumption of fingerprinting or some alternative means of acquiring a handgun permit pending the final resolution of their constitutional claims.

I will grant the motion for a preliminary injunction. As an initial matter, I find no merit to any of the Governor and Commissioner's threshold jurisdictional arguments: that they are entitled to Eleventh Amendment immunity, that plaintiffs have no standing, or that plaintiffs' request for injunctive relief is moot. On the merits, I conclude that plaintiffs have demonstrated irreparable harm, that they have a clear and substantial likelihood of success on the merits of their Second Amendment claim, and that the balance of equities and public interest weighs in favor of a grant of preliminary injunctive relief.

All in all, I can well understand why the Governor's order and Commissioner's actions were justified at the outset of the COVID-19 pandemic. But with the passage of time it is clear that a categorical ban on the collection of fingerprints no longer bears a substantial relation to protecting public health consistent with respecting plaintiffs' constitutional rights. Accordingly, I will enter a preliminary injunction to require the Governor and the Commissioner to take the necessary steps to allow for the resumption of fingerprint collection activities not later than one week from now on June 15, 2020.

**BACKGROUND**

***Connecticut's handgun permit and certificate requirements***

Like many states, Connecticut has a permit system that regulates the possession and transfer of firearms. Under Connecticut law, subject to certain exceptions, no person shall carry a pistol or revolver ("a handgun") upon his or her person outside the dwelling place or place of business unless the person has a permit. *See* Conn. Gen. Stat. § 29-35(a); *see also* Conn. Gen.

Stat. § 29-36f (prescribing requirements for handgun eligibility certificate); Conn Gen. Stat. § 29-27 (defining terms "pistol" and "revolver" to mean "any firearm having a barrel less than twelve inches in length"). It is generally a crime for a person to purchase or receive a handgun unless the person holds a valid handgun permit or certificate. *See* Conn. Gen. Stat. § 29-33(b), (i); *see also* Conn. Gen. Stat. § 29-38m (sale of ammunition to an unpermitted or uncertificated person is a Class D felony).

Connecticut law prescribes a two-step process to obtain a handgun permit. *See Kuck v. Danaher*, 822 F. Supp. 2d 109, 119-21 (D. Conn. 2011) (describing permitting requirements). First, one must file an application for a temporary permit in the town or city in which the applicant resides. *See* Conn. Gen. Stat. §§ 29-28(b) 29-28a. Unless the applicant's fingerprints are already on file, the applicant must show up in person to the local town hall or police station to have his or her fingerprints taken. *See* Conn. Gen. Stat. § 29-29(b). Fingerprinting may be done by DESPP if an applicant lives in one of the approximately eighty towns without a local police force that provides fingerprinting services.[1] These fingerprints are then used to conduct a criminal background check. *See* Conn. Gen. Stat. §§ 29-17a, 29-29(b).

Similarly, a person who is applying for a handgun eligibility certificate must apply directly to DESPP, and DESPP in turn requires the applicant to submit to fingerprinting. *See* Conn. Gen. Stat. § 29-36g; Doc. #58-16 (Giannone affidavit). The holder of a handgun eligibility certificate may acquire a handgun but is not authorized to carry the handgun off his residential or business premises as may the holder of a handgun permit. *See* Conn. Gen. Stat. 29-36g(f).

---

[1] *See* Doc. #58-13 (Gervais affidavit); Doc. #64-1 (Silcox affidavit); Conn. Gen. Stat. § 29-5 (providing for resident trooper towns); *see generally* Veronica Rose, *Connecticut Town Under State Police Jurisdiction*, CONN. OFFICE OF LEG. RES. REPORT, No. 2016-R-0246 (Oct. 26, 2016), https://www.cga.ct.gov/2016/rpt/pdf/2016-R-0246.pdf (last accessed June 8, 2020) [https://perma.cc/D82G-QRA6].

Regardless whether an applicant seeks a handgun permit or a handgun eligibility certificate, state law prohibits state or local law enforcement officials from refusing to collect fingerprints when needed by an applicant for a criminal background investigation:

> No employee of a municipal police department or the Division of State Police within the Department of Emergency Services and Public Protection shall refuse to collect the fingerprints of a person requesting such fingerprinting for the purposes of a criminal history records check in accordance with section 29-17a, or other noncriminal purposes, provided (1) such employee's duties include fingerprint collection, and (2) the person requesting such fingerprinting works or resides in the municipality where such department or division is located.

Conn. Gen. Stat. § 29-17c(a); *see also id.*, § 29-17c(b) ("The provisions of this section shall not be construed to prohibit a municipality from establishing a limited period of hours during which such fingerprints may be collected").

Connecticut law imposes time limits to require prompt consideration of an application for a handgun permit or a handgun eligibility certificate. A local authority has a maximum of eight weeks after receipt of a "sufficient application" to either approve or deny a temporary permit. *See* Conn. Gen. Stat. § 29-28a(b). Temporary permits are, as the name suggests, temporary, with a sixty-day expiry date. *See* Conn. Gen. Stat. § 29-30(c). For a permanent state permit, the local authority must forward the temporary permit application to DESPP, the applicant must appear at a DESPP location, and DESPP must act upon the application within eight weeks of its receipt. Conn. Gen. Stat. §§ 29-28(b), 29-28a(b). For handgun eligibility certificate applicants, DESPP must act on an application within 90 days. *See* Conn. Gen. Stat. § 29-36g(b)(2). The applicant may appeal a denial of a temporary or permanent permit or certificate to the Board of Firearms Permit Examiners. *See* Conn. Gen. Stat. § 29-32b(b).

### *Executive Order No. 7E and the suspension of fingerprinting*

On March 10, 2020, Governor Lamont declared a public health emergency in light of the COVID-19 pandemic. Doc. #58-1 at 1. The Governor declared that the emergency "shall remain in effect through September 9th, 2020, unless terminated earlier by me." *Ibid.* The Governor's declaration invokes his statutory authority under Conn. Gen. Stat. § 19a-131a and Conn. Gen. Stat. § 28-9. Among the powers of the Governor under section 28-9 is to "modify or suspend in whole or in part, by order as hereinafter provided, any statute . . . whenever the Governor finds such statute . . . is in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health." Conn. Gen. Stat. § 28-9(b)(1).

The Governor has since issued dozens of executive orders setting forth protective measures to reduce the threat to Connecticut from COVID-19.[2] As relevant here, the Governor issued Executive Order No. 7E on March 17, 2020. Doc. #58-4. Among other things, Executive Order No. 7E suspends the requirement of Conn. Gen. Stat. § 29-17c(a) that local and state police employees may not refuse to collect fingerprints for background checks. The Governor's order leaves it to the "discretion" of these officials whether to "limit *or eliminate* fingerprinting hours to limit the transmission of COVID-19 or focus resources on critical public safety needs." Ct. Exec. Order No. 7E (March 17, 2020), *available at* Doc. #58-4 (emphasis added).[3] The order

---

[2] *See generally* Ned Lamont, *Governor Lamont's Executive Orders*, https://portal.ct.gov/Office-of-the-Governor/Governors-Actions/Executive-Orders/Governor-Lamonts-Executive-Orders (last accessed June 8, 2020) [https://perma.cc/SR97-V2W3].

[3] The relevant paragraph of the order provides in full as follows:

> **Suspension of Required Fingerprinting Availability.** Section 29-17c(a) of the Connecticut General Statutes, which prohibits employees of a municipal police department or the Division of State Police within the Department of Emergency Services and Public Protection from refusing to collect the fingerprints of a person requesting such fingerprinting for the purposes of a criminal history records check, is hereby suspended. The chief of police or Commissioner of Emergency Services and Public Protection or his designee, subject to their discretion, may limit or eliminate

(continued…)

further states that it "shall take effect immediately and shall remain in effect for the duration of the public health and civil preparedness emergency, unless earlier modified by me." *Ibid.*

On the same day that the Governor issued Executive Order No. 7E, DESPP Commissioner James Rovella issued a memorandum to the public advising that "[i]n accordance with Governor Lamont's Executive Order No. 7E, I hereby order a suspension of all fingerprinting services at DESPP Headquarters in Middletown and all State Police Barracks pursuant to Section 27-17c(a) for up to ninety (90) days." Doc. #58-3 at 1; *see also* Doc. #58-2 at 1 (Connecticut State Police posting on Facebook stating that "all criminal background fingerprinting at State Police Troops and Headquarters will be suspended" and that "[b]ased upon close face to face contact, the suspension of services is intended to limit the transmission of COVID-19").

In addition to suspending fingerprinting, DESPP declined, at least in some cases, to schedule the needed appointments to convert temporary permits to permanent ones. *See* Doc. #58-13 at 2 (¶ 7). A DESPP employee with responsibility for permits explained by affidavit that, apparently owing to "DESPP shutting down the building . . . in an abundance of caution to protect our personnel, most of which are civilian, from exposure to COVID-19," DESPP "has been unable to process new pistol permits." Doc. #58-16 at 8 (¶ 33). DESPP continued, however, to process permit renewals by mail. *Id*. at 8 (¶ 32).

---

fingerprinting hours to limit the transmission of COVID-19 or focus resources on critical public safety needs. The Department of Emergency Services and Public Protection shall continue to perform fingerprinting services for long term care providers pursuant to section 19a-491c of the general statutes at its headquarters in Middletown. Unless modified by further order of the Commissioner or me, State Police barracks will continue to remain open to the general public for other business.

Although this order includes an exception for long-term care providers, the Governor issued another order six days later that has the effect of suspending criminal background checks for long-term care providers. Doc. #58-22 (Executive Order No. 7K).

*Plaintiffs' lawsuit and the motion for preliminary injunction*

On April 10, 2020, Holly Sullivan—the president of the Connecticut Citizens Defense League ("CCDL")—wrote a certified letter to Governor Lamont raising concerns about his suspension of the fingerprint collection requirements under Conn. Gen. Stat. § 29-17c(a). Doc. #58-6. The letter explained that CCDL represents 36,000 members committed to the constitutional right to bear arms and objected that the suspension of fingerprinting had effectively halted the issuance of firearms permits in Connecticut. *Ibid.* Sullivan requested that the fingerprinting requirement be reinstated immediately or that an alternative to fingerprinting be accepted, and she requested that an appropriate person from the Governor's office contact her in order to avoid the need for litigation. *Ibid.*

On May 9, 2020, plaintiffs filed this lawsuit against Governor Lamont, DESPP Commissioner Rovella, and the police chiefs of Ansonia, Bristol, Farmington, and Vernon, Connecticut. *See* Doc. #1. The plaintiffs are CCDL and six of its members who allege that they have been prevented by the defendants from having their fingerprints taken or their permit applications processed. The plaintiffs allege that refusal to take fingerprints and to process their permit applications amounts to a violation of the Second Amendment, the Due Process Clause, the Equal Protection Clause, and the Privileges and Immunities Clause of the U.S. Constitution. *See* Doc. #26 (operative complaint).

Accompanying the complaint was a motion for a temporary restraining order and preliminary injunction. Doc. #3. I issued briefing orders and, in view of the rapidly changing circumstances relating to the COVID-19 pandemic, I convened a status conference to encourage counsel to negotiate and to meet with a U.S. Magistrate Judge with a view toward reaching a temporary accommodation that would eliminate the need for the Court to consider entry of an

order of preliminary relief. The four police chief defendants reached such agreements with plaintiffs, with each of the four police departments promptly agreeing to resume fingerprinting services as of May 20 and May 21, 2020. Docs. #42-#45. In response, plaintiffs have withdrawn their motion for a preliminary injunction against these four defendants. *See* Doc. #57. The remaining defendants—Governor Lamont and Commissioner Rovella—have not reached agreement with plaintiffs, and therefore the motion for preliminary injunction is now directed only as to plaintiffs' request for relief against the Governor and the Commissioner.

On June 1, 2020, I conducted a video hearing with counsel for plaintiffs and for the Governor and the Commissioner. The hearing and this ruling are based on a series of witness affidavits and documents submitted by the parties. *See* Docs. #58, #60. *See generally* 11A WRIGHT & MILLER, FED. PRAC. & PROC. § 2949 (3d. ed.) (evidentiary standards for preliminary injunction hearings).

## DISCUSSION

### I.  Jurisdiction

Before turning to consider the merits of plaintiffs' motion for a preliminary injunction standard, I must satisfy myself that there is federal jurisdiction over this case. The Governor and the Commissioner argue that this action is not justiciable because they have Eleventh Amendment immunity, because plaintiffs lack standing, and because the request for injunctive relief has been mooted by events subsequent to the filing of this lawsuit.

#### A.  Eleventh Amendment immunity

The Governor and the Commissioner argue that they are entitled to Eleventh Amendment immunity. Although it is true that the Eleventh Amendment generally bars federal courts from awarding money damages and other forms of retrospective relief against the State as well as state officials, there is a long-recognized exception for lawsuits against individual state officers that

8

seek prospective injunctive relief for ongoing violations of the Constitution. *See Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253-55 (2011) (citing *Ex parte Young*, 209 U.S. 123 (1908)); *Nat'l Ass'n for Advancement of Colored People v. Merrill*, 939 F.3d 470, 475 (2d Cir. 2019). Because plaintiffs plainly allege that the Governor and the Commissioner are engaged in an ongoing violation of their constitutional rights and because the Governor and Commissioner fail altogether to argue why the well-recognized exception should not apply, I conclude that the Eleventh Amendment does not bar my review of the motion for a preliminary injunction.

### B. Standing

The Governor and the Commissioner argue that plaintiffs lack standing. Article III of the U.S. Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. From this case-or-controversy requirement comes the principle that any plaintiff in a federal court must have "standing" to assert his or her claim—specifically, a plaintiff must show (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable decision. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *United States v. Smith*, 945 F.3d 729, 736 (2d Cir. 2019).

Importantly, "[t]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*," *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008) (emphasis added); *see also Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 126 (2d Cir. 2020) (same). In this way, the doctrine of standing is distinct from the doctrine of mootness, which concerns whether what was once a "case" or "controversy" has ceased to be so because of intervening events. Many of the Governor

and Commissioner's arguments about standing overlook this critical temporal distinction between standing and mootness.

Each of the individual plaintiffs easily satisfied the requirements for standing on the date last month that this lawsuit was filed. *See* Doc. #1. Five of the six individual plaintiffs allege that they contacted local police to apply for a pistol permit but that they were turned away because of the lack of fingerprint collection. Docs. #58-8 to #58-12. The sixth individual plaintiff's fingerprints had already been collected by May 9, 2020, but he alleges that DESPP refused to process his permit application. Doc. #58-13. These allegations are enough to conclude that the individual plaintiffs have sustained a specific injury and one that is fairly traceable to the defendants and redressable by a court order in their favor.

Denial of a government-issued permit is a quintessential injury-in-fact for purposes of standing. *See, e.g.*, *Parker v. D.C.*, 478 F.3d 370, 376 (D.C. Cir. 2007) (denial of registration certificate to own handgun), *aff'd sub nom. D.C. v. Heller*, 554 U.S. 570 (2008). Although the Governor and the Commissioner argue that the ultimate grant of a permit depends upon many contingent factors beyond fingerprinting, they do nothing to show that any of the individual plaintiffs were ineligible to apply for or to receive a firearm permit (such as having a criminal record or being under the age of 21) or to show any reason why they would not have received a permit if their fingerprints had been collected and submitted.

Nor is there any merit to the arguments of the Governor and the Commissioner that a "temporary delay" occasioned by the suspension of fingerprinting does not result in injury. If the Governor and the Commissioner were to issue a gag order barring plaintiffs from exercising their First Amendment free speech rights for the balance of the COVID-19 crisis, plaintiffs would surely suffer injury despite the "temporary" nature of the crisis. The same holds true for

plaintiffs' exercise of their Second Amendment rights. *See United States v. Decastro*, 682 F.3d 160, 167 (2d Cir. 2012) (noting that "[i]n deciding whether a law substantially burdens Second Amendment rights, it is therefore appropriate to consult principles from other areas of constitutional law, including the First Amendment").

Plaintiffs have also shown that their injury is fairly traceable to both the Governor and the Commissioner. The Commissioner controls fingerprinting at various DESSP locations (including provision of fingerprinting for dozens of towns that do not have their own police departments), and he expressly invoked the Governor's issuance of Executive Order No. 7E when he announced, on March 17, 2020, that he was suspending fingerprinting at DESSP facilities for "up to ninety (90) days." Doc. #58-3 at 1.[4] The Commissioner acknowledges he persuaded the Governor to suspend the statutory fingerprint collection requirements "I sought, via counsel, an executive order to temporarily suspend this requirement [of Conn. Gen. Stat. § 29-17c(a)] so that we could turn away members of the public seeking fingerprints at DESPP headquarters and at State Police barracks." Doc. #58-17 at 3 (¶ 19).

As for the Governor, I conclude that the fairly traceable requirement is also satisfied. Although Executive Order No. 7E does not compel any police department or DESSP to stop fingerprinting, it suspends the long-established law that required them to do so. *See* Conn. Gen. Stat. § 29-17c(a). Just as the Commissioner openly acknowledged that he suspended fingerprinting "[i]n accordance with Governor Lamont's Executive Order No. 7E," Doc. #58-3 at 1, it is reasonable to conclude that local police departments across the State similarly suspended

---

[4] The Commissioner's directions also led to suspension of DESSP in-person processing of applications, a suspension that blocked processing of one of the plaintiff's permit applications. *See* Docs. #58-3 (Commissioner notice); #58-13 (Gervais affidavit). Although DESPP processing has now resumed, this change in circumstances goes to the issue of mootness not standing.

fingerprinting because of the Governor's order. One of defendants' affiants (Sergeant Alessandro Giannone) acknowledges that "[s]ince the issuance of the Governor's Executive Order . . . local authorities shut[] down their temporary pistol permit process." Doc. #58-16 at 8 (¶¶ 32-33).

The "fairly traceable" requirement is a less "onerous standard" than "that of proximate causation," and "[a] defendant's conduct that injures a plaintiff but does so only indirectly, after intervening conduct by another person, may suffice for Article III standing." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55-56 (2d Cir. 2016). Had the Governor *not* chosen to suspend the dictates of the state law fingerprinting requirement, it is hard to believe that local police departments would have opted on their own to disregard the law. Accordingly, plaintiffs have adequately shown that their inability to obtain handgun permits is fairly traceable to the Governor's executive order. Overall, the individual plaintiffs have shown standing to maintain this action at this preliminary stage of the litigation.

As for plaintiff CCDL, an organization "may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). For an organization, "only a perceptible impairment of an organization's activities is necessary for there to be injury in fact." *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011). Thus, for example, an organization has standing to challenge a governmental action if the action has required the organization to divert its resources from its current activities or if it has had to spend money to combat activity that harms its core activities. *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110-11 (2d Cir. 2017). "Courts have distinguished between cases where a defendant's conduct forced a plaintiff to divert its resources and provide *new* services, therefore giving rise to organizational standing, and cases where a plaintiff was *already*

providing the services at issue and therefore failed to allege any injury." *Make the Rd. New York v. Cuccinelli*, 419 F. Supp. 3d 647, 657 (S.D.N.Y. 2019) (cleaned up, emphasis in original).

The facts here illustrate that the actions of the Governor and the Commissioner have indeed required CCDL to divert its resources to undertake new activities in light of Executive Order No. 7E. Holly Sullivan as president of the CCDL attests that "CCDL has, and continues[] to expend and divert its resources" because of these adverse actions. Doc. #58-18 at 2 (¶ 15). This has included Sullivan's pre-litigation letter to the Governor on April 10 as well as her extensive communications (including prior to this litigation) with CCDL members throughout Connecticut whose efforts to apply for firearms permits have been stymied because of the defendants' actions and who have sought help from CCDL. *Id.* at 1, 3-25. These new activities have detracted from CCDL's usual activities to engage in legislative and grassroots advocacy, education, and research on behalf of Second Amendment rights. *Id.* at 2. At this preliminary stage of the litigation, CCDL has sufficiently shown organizational standing to maintain this action.

### C. Mootness

Mootness is yet another limit on a federal court's jurisdiction. "If, as a result of changed circumstances, a case that presented an actual redressable injury at the time it was filed ceases to involve such an injury, it ceases to fall within a federal court's Article III subject matter jurisdiction and must be dismissed for mootness." *Janakievski v. Exec. Dir., Rochester Psychiatric Ctr.*, 955 F.3d 314, 319 (2d Cir. 2020). In contrast to the burden that falls on a plaintiff to prove standing, it is the defendant who bears the burden to prove that a change of

circumstances has rendered a case moot. *See Mhany Management, Inc. v. City of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016).[5]

There are several changed circumstances since the filing of this lawsuit. The first change is that the four police chiefs who have been sued as defendants in this action have resumed fingerprinting in their localities as of May 20 and May 21, 2020, and this has resulted in plaintiffs' withdrawing their motion for a preliminary injunction against any of the police chief defendants. *See* Docs. #42-#45, #57.

The second change is that DESPP has resumed its in-person processing of permit applications as of May 26, 2020, but it has not resumed fingerprinting. Doc. #58-20 at 1-2. Relatedly, the third change is that Commissioner Rovella has announced that DESPP will resume its fingerprinting operations on June 15, 2020. Doc. #64-2 at 1 (¶ 3(c)). More recently still, counsel for the Governor has filed a "notice" stating that the Governor "intends to repeal the provisions of Executive Order 7-E which suspended state statutes prohibiting law enforcement officials from refusing to take fingerprints for purposes of criminal background checks," and that "[t]he repeal will be effective June 15 and will be reflected in an Executive Order, prior to that date." Doc. #69 at 1.

I am not convinced that the stated commitments for the resumption of fingerprinting moot plaintiffs' motion for preliminary injunctive relief against the Governor and the Commissioner. "A defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's*

---

[5] Because mootness goes to the Court's subject matter jurisdiction, which requires examination even if no party raises the issue, I will deny plaintiffs' motion to strike (Doc. #50) the defendants' supplemental brief which raised the mootness issue for the first time. Still, "[t]he Supreme Court has viewed mootness claims skeptically when they are not timely raised." *See Mhany Management*, 819 F.3d at 604.

*Castle, Inc*., 455 U.S. 283, 289 (1982). "The voluntary cessation of allegedly illegal activities will usually render a case moot if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Mhany Management*, 819 F.3d at 603 (cleaned up).

A defendant seeking to establish mootness in light of voluntary cessation has "both a stringent and a formidable burden." *Id.* at 604 (internal citation omitted). The defendant must show "it is *absolutely clear* the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 603-04 (emphasis in original). Thus, for example, the fact that a municipality has enacted a "repeal of the objectionable language" of an ordinance has been found not to moot a case where it "would not preclude [the municipality] from reenacting precisely the same provision if the District Court's judgment were vacated." *Id.* at 604 (quoting *City of Mesquite*, 455 U.S. at 289).

The Commissioner's stated intention to resume DESPP fingerprinting as of June 15 arises in the context of the third affidavit he has submitted during the litigation of this motion. Doc. #64-2. This latest affidavit was submitted on June 2, 2020, only after lengthy oral argument on the motion for preliminary injunction. It is in some tension with the Commissioner's first affidavit of May 21 that declined to specify the date when fingerprinting would resume while listing 23 different conditions that would have to exist before this could happen, Doc. #58-17 at 4-5 (¶¶ 22-24), as well as the Commissioner's second affidavit of May 29 that made no mention at all of any date to resume fingerprinting, Doc. #58-20.

Similarly, I am less than confident in counsel's representation about what the Governor intends to do. Initially, the representation about the Governor's intentions arrived by an email

15

from counsel to chambers, and it was only because the Court entered an order instructing that any such representation must of course be formally filed on the docket that this representation is even a part of the record in this case. Doc. #68. In light of the rapidly shifting litigation maneuvers of counsel for the Governor and Commissioner, I decline to conclude that the representations about what the Commissioner and the Governor intend to do on June 15 offer sufficient assurance that the challenged conduct will be permanently discontinued, as would be required to moot plaintiffs' request for injunctive relief. *See Mhany Management*, 819 F.3d at 604 (declining to find that county's actions rendered dispute moot in light of "suspicious timing" of changed circumstances that "appear to track the development of this litigation").

Nor is there any assurance given by the Governor and the Commissioner that they will not seek to discontinue fingerprinting again in the future. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017) (governor's announcement that "he had directed the Department to begin allowing religious organizations to compete for and receive Department grants on the same terms as secular organizations" did not moot action absent assurance that governor "could not revert to its policy of excluding religious organizations").

In any event, because fingerprinting operations have not yet resumed (despite the defendants' announced intention under litigation pressure to resume them), I conclude that plaintiffs' request for injunctive relief is not moot. The record before me suggests that not only DESPP but also numerous police departments continue to this day to deny fingerprinting services as a consequence of the actions of the Governor and the Commissioner. *See* Doc. #58-18 at 1 (¶ 6) (CCDL president's listing of numerous localities including Canton, Centerbrook, East Canaan, East Hampton, Hamden, Harwinton, Plainfield, Plainville, Southington, Suffield, Wethersfield, Windsor, and Woodstock where members of CCDL "have been prevented, in

16

various ways, from initiating and/or completing the pistol permit application process as a result of Governor Lamont's Executive Order 7E"); *id.* at 3-25 (correspondence from members); Doc. #64 at 3 n.1 (supplemental brief of the Governor and Commissioner conceding that fingerprinting has yet to resume in Southington or Wethersfield). Plaintiffs' motion is not moot, and this means I must consider their motion on its merits.

### II. Preliminary injunction

In order for the Court to issue a preliminary injunction, plaintiffs must satisfy a four-part test: (1) that they have suffered irreparable harm, (2) that they have a clear or substantial likelihood of success on the merits, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *See Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs*., 769 F.3d 105, 110 (2d Cir. 2014). Because plaintiffs challenge governmental action allegedly taken in the public interest pursuant to a statutory or regulatory scheme, it is not enough for plaintiffs to show, as they might in a private civil case, merely that there are serious questions that are fair ground for litigation. *Ibid.*

Furthermore, because plaintiffs seek a "mandatory injunction" rather than just a "prohibitory injunction," they must show a "clear" or "substantial" likelihood of success on the merits. *See N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc*., 883 F.3d 32, 37 (2d Cir. 2018). A mandatory injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (cleaned up).

### A. *Irreparable harm*

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction," and plaintiffs must show that "absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). The violation of a constitutional right is the type of harm that is ordinarily considered to be irreparable. *See Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004). This is no less so for the violation of the Second Amendment right to bear arms—a right that exists in part for immediate reasons of personal self-protection and for the violation of which there is no adequate remedy at law in the form of damages. *See Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011); *Grace v. Dist. of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016), *aff'd* 864 F.3d 650 (D.C. Cir. 2017).[6]

Plaintiffs have shown irreparable harm. In the absence of any opportunity to have their fingerprints collected, CCDL members are excluded from the only process by which the State of Connecticut allows private citizens to lawfully acquire or receive a handgun. Although the State's permit process takes some time, the law requires a decision within eight weeks on an application at both the local and state levels. *See* Conn. Gen. Stat. § 29-28a(b). An applicant who is unable to have his or her fingerprints collected in the first instance has no other means even to initiate and access this process. Plaintiffs will be irreparably harmed if the suspension of the

---

[6] The Governor and the Commissioner argue that the harm is not irreparable because plaintiffs may appeal the constructive denial of their permits to the State Board of Firearms Permit Examiners. But at oral argument counsel conceded that the Board would not have authority to consider the legal validity of orders suspending the rights of applicants to have their fingerprints collected for purposes of a permit application. In any event, the fact that there may be some administrative process available to seek relief for the denial of a constitutional right does not signify that the denial of that right in the interim does not result in irreparable harm. *Cf. Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 516 (1982).

fingerprinting collection requirement under Conn. Gen. Stat. § 29-17c(a) is allowed to continue while they wait for a final adjudication by this Court.

### B.  Likelihood of success

The Second Amendment provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. As incorporated against the states, "the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 749-50 (2010); *see generally District of Columbia v. Heller*, 554 U.S. 570 (2008). In particular, the Second Amendment right to bear arms "applies to handguns because they are the most preferred firearm in the nation to 'keep' and use for protection of one's home and family." *McDonald*, 561 U.S. at 767 (cleaned up).

When evaluating a Second Amendment challenge to a governmental enactment, a court should engage in a two-step inquiry. *See United States v. Jimenez*, 895 F.3d 228, 236 (2d Cir. 2018) (citing *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 253 (2d Cir. 2015)). First, a court must consider whether the government restriction burdens conduct protected by the Second Amendment. *Ibid.* If so, then a court must determine and apply the appropriate level of scrutiny. *Ibid.*

The Governor's Executive Order No. 7E and the Commissioner's implementation of the order plainly burden conduct protected by the Second Amendment. Because these actions result in the suspension of fingerprinting while *not* suspending the statutes that make fingerprinting necessary to issuance of a handgun permit or certificate, they categorically foreclose a person who does not already have a permit or certification from acquiring a handgun if the person's

fingerprints are not already on file. One cannot exercise the right to possess a handgun in the home for self-defense if one is prevented from acquiring a handgun in the first place.

Of course, the Governor's Executive Order No. 7E does not itself suspend fingerprinting. But, as discussed above, it suspends the statutory requirement that DESPP and local authorities engage in fingerprinting, leaving it to the unbounded discretion of DESPP and local authorities whether to halt fingerprinting services. Because there is no reason to suppose that DESPP and local authorities would fail to comply with the statutory requirement unless it were suspended, the Governor's suspension of the statutory requirement has had the foreseeable effect of causing the suspension of fingerprinting by DESPP and local police departments. The Governor's order has therefore burdened the Second Amendment right to bear arms by effectively shutting down the application process for new handgun permits and certificates.

The next step is to select and apply the level of scrutiny. But I need not choose between whether intermediate or strict scrutiny applies here, *see Ezell*, 651 F.3d at 699, because the indefinite suspension of fingerprinting that is essential to the issuance of a pistol permit does not meet even the lower standard of intermediate scrutiny.

To withstand intermediate scrutiny, a law must generally be "substantially related to the achievement of an important governmental interest." *Jimenez*, 895 F.3d at 236. The "fit" between the challenged action and the governmental interest need not be "perfect" but must be "substantial" with "reasonable inferences based on substantial evidence." *New York State Rifle*, 804 F.3d at 261 (internal citations and quotations omitted). Thus, in a case "implicating the core of the Second Amendment right," the Seventh Circuit has applied intermediate scrutiny to require a municipality to "establish a close fit between the [firing] range ban and the actual

public interests it serves, and also that the public's interests are strong enough to justify so substantial an encumbrance on individual Second Amendment rights." *Ezell*, 651 F.3d at 708-09.

To begin, there is no doubt that the Governor and the Commissioner have a compellingly important government interest: protection of law enforcement personnel, permit applicants, and Connecticut residents generally from infection by the COVID-19 virus. This is undoubtedly the type of interest that may warrant the government to engage in extreme measures to protect public health. Thus, for example, it is well-established that the government may enforce mandatory vaccination requirements notwithstanding an individual's liberty interest to the contrary. *See Phillips v. City of New York*, 775 F.3d 538, 542-43 (2d Cir. 2015); *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). That is because "in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Id.* at 29.

Still, as the Supreme Court recognized in *Jacobson*, the courts retain a role to examine the use of governmental power even during a public health emergency, for "an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons." *Id.* at 28; *see also* Lindsay F. Wiley and Stephen I. Vladeck, *Coronavirus, Civil Liberties, and the Courts: The Case Against 'Suspending' Judicial Review*, 133 HARV. L. REV. F. (forthcoming 2020), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3585629 [https://perma.cc/7ZGX-9VKM].

In other words, just as "a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens," *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004), the COVID-19 crisis does not mean that government officials have limitless discretion to intrude on the rights of the people. Nevertheless, courts owe great deference to the protective measures ordered by government officials in response to the COVID-19 crisis, not simply because the virus has lethal consequences but also because the virus acts in unknown ways that engender uncertainty about what scope of protective measures are warranted. *See S. Bay United Pentecostal Church v. Newsom*, — S.Ct. —, 2020 WL 2813056 (2020) (Roberts, C.J., concurring) (discussing the need for deferential judicial review of COVID-19 protection measures).

Even granting these principles of deference and even granting the wisdom of the decisions of the Governor and the Commissioner to initially suspend all fingerprinting at the outset of the COVID-19 pandemic, the Governor and the Commissioner have not shown that there continues to be a substantial fit between the goal of protecting people from COVID-19 and a suspension of all fingerprinting collection requirements. The fact that the four police chief defendants have resumed fingerprinting activities and that the Commissioner has stated his intent for DESPP to resume fingerprinting activities on June 15 is powerful evidence that the ongoing suspension of fingerprinting has become needlessly overbroad—that it does not continue to be a reasonable and substantial fit to the necessity of protecting public health in light of alternative and available protective measures for the police to use when collecting an applicant's fingerprints.

Indeed, the Commissioner himself in one of his affidavits lists available protective measures that would be less overbroad than a shutdown of the permitting process. Doc. #58-17 at

4-5 (¶ 24) (scheduled appointments, limited hours and days of operation, temperature checks, plexi-glass barriers, social distancing between waiting applicants, use of masks and protective personal equipment, and sanitization between uses of equipment). These are the types of protective measures that have already been approved by the Governor and put into operation across broad sectors of the state economy, including even for business activities involving close and extended personal interaction such as at hair salons and barbershops.[7] What is expected from a barber or hair stylist is not too much to expect from a police officer in the service of allowing the people to exercise their constitutional rights. The police continue to routinely collect fingerprints from arrestees, and there is no showing why collecting fingerprints from those who seek to exercise their constitutional rights is categorically too hazardous to allow for the indefinite future.

The U.S. Constitution permits the States to set out a procedural road to lawful handgun ownership, rather than simply allowing anyone to acquire and carry a gun. *See Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 98 (2d Cir. 2012). That road may be long. *See Silvester v. Harris*, 843 F.3d 816, 828 (9th Cir. 2016) (upholding waiting period). It may be narrow. *See Jimenez*, 895 F.3d 237 (upholding ban on firearm possession by persons dishonorably discharged from the military for felony-equivalent conduct). It may even have tolls. *See Kwong v. Bloomberg*, 723 F.3d 160, 167-69 (2d Cir. 2013) (upholding handgun licensing fee). But it may not be built only to be indefinitely closed down when there are evident alternatives to achieve the government's countervailing compelling interest.

---

[7] *See* State of Connecticut, Sector Rules and Certification for Reopen, Hair Salons & Barbershops (to open June 1, 2020), available at https://portal.ct.gov/DECD/Content/Coronavirus-Business-Recovery/Sector-Rules-and-Certification-for-Reopen (last accessed June 8, 2020).

That is what has happened here by means of suspending the requirement that the police collect an applicant's fingerprints while still demanding such fingerprints for approval of a handgun permit. Plaintiffs have shown a clear and substantial likelihood of success on the merits of their Second Amendment claim.[8]

### C.   Balance of equities and public interest

There are plainly public interests on each side in this proceeding. On the one hand, the public has an interest in limiting the transmission of COVID-19, preserving the resources of the emergency and police services, and using fingerprinting to preserve a robust and error-free criminal background check process for gun permit applicants, *see* Doc. #64-1 (Silcox affidavit). On the other hand are the interests of law-abiding Connecticut residents who lawfully seek to exercise their constitutional rights under the Second Amendment to acquire and possess handguns for self-defense.

On review of the balance of equities, I conclude that these concerns weigh in favor of plaintiffs, in light of the ample evidence as discussed above that a continuing categorical elimination of fingerprinting is not necessary. Still, to ensure that there is adequate time for police authorities to be fully and safely prepared to resume fingerprinting activities, it is appropriate to delay the effective date for an injunction for one week until June 15, 2020.

I will therefore enter a preliminary injunction to require that by June 15, 2020, the Governor of Connecticut shall enter an order modifying Executive Order No. 7E so that the order no longer suspends the fingerprint collection requirements under Conn. Gen. Stat. § 29-17c(a) for applicants seeking permits or certificates to acquire or possess firearms that are subject to

---

[8] In view of my conclusion with respect to the Second Amendment, I need not address the plaintiffs' remaining constitutional claims.

protection of the Second Amendment. I will further enter an order to require that by June 15, 2020, the Commissioner resume fingerprinting activities at DESPP locations as required under Conn. Gen. Stat. § 29-17c(a) for applicants seeking permits to acquire or possess weapons that are subject to protection of the Second Amendment.[9] The injunction will not require the resumption of fingerprinting activities unnecessary to the exercise of rights under the Second Amendment. Nor will the injunction affect the discretion allowed by law for the limitation of the hours for fingerprint processing. *See* Conn. Gen. Stat. § 29-17c(b).

CONCLUSION

For the forgoing reasons, plaintiffs' motion for a preliminary injunction is GRANTED as follows:

(1) The Governor of Connecticut shall modify Executive Order No. 7E so that as of June 15, 2020, the fingerprint collection requirements imposed by law under Conn. Gen. Stat. § 29-17c(a) are no longer suspended for applicants who seek fingerprints for purposes of a permit or certificate to acquire, carry, or possess firearms that are subject to protection under the Second Amendment; and,

(2) The Commissioner of the Department of Emergency Services and Public Protection shall not later than June 15, 2020, resume fingerprint collection activities at DESPP locations as required under Conn. Gen. Stat. § 29-17c(a) for applicants seeking

---

[9] Although plaintiffs have proposed an injunction that would allow for the defendants to institute alternatives to fingerprinting, I understand defendants to insist on the necessity of fingerprinting and, in any event, to have stated their preparedness for the resumption of fingerprinting activities as of June 15, 2020, so there is no need for me to address alternatives to fingerprinting. In light of the Commissioner's undisputed resumption of permit processing activity (as distinct from fingerprint collection activities), I will not at this time enter an injunction to require the Commissioner to continue such activity, subject to the right of plaintiffs to seek further preliminary injunctive relief in the event that they have grounds to show that the Commissioner has discontinued permit processing activities in a manner that violates plaintiffs' Second Amendment rights.

permits to acquire, carry, or possess firearms that are subject to protection under the

Second Amendment.

It is so ordered.

Dated at New Haven this 8th day of June 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge